## MORAN *v.* PITTSBURGH, C. & ST. L. RY. CO. and others.

*(Circuit Court, S. D. Ohio, E. D.* November 24, 1887.)

1. MORTGAGE—SUBSEQUENT LEASE—RIGHTS OF MORTGAGEE.
   Where a lease is executed by a mortgagor subsequent to the mortgage, and there is no privity of estate or contract thereby created between the mortgagee and lessee, and there is no attornment by lessee to mortgagee, the mortgagee cannot, either before or after the mortgagor's default, demand the benefits of the lease without the consent of the lessee.

2. SAME—AFTER-ACQUIRED PROPERTY—RAILROAD LEASE.
   A railway company gave a mortgage to secure its coupon bonds, conveying all the property which it then possessed, or should thereafter acquire, and subsequently executed a lease, to which the mortgagee was not a party, whereby the lessee agreed to pay the coupons at maturity, in the event the net earnings of the demised road should not be sufficient to protect the interest on the bonds. In a suit to foreclose the mortgage, *held,* that the lease was not "after-acquired property," within the meaning of the mortgage.

In Equity. Suit for foreclosure of mortgage.
*Geo. Hoadly,* for complainant.
*Harrison, Olds & Marsh* and *T. M. Estep,* for defendants.

JACKSON, J. Under proper authority of law and resolutions of the corporation, the Cincinnati & Muskingum Valley Railway Company

(hereinafter, for brevity, called the "Valley Railway Company") on September 1, 1870, executed to Charles Moran and I. Edgar Thomson, as joint trustees, a conveyance of its property, to secure certain bonds of the company to the amount of $1,500,000, dated September 1, 1870, and payable January 1, 1901, with interest coupons attached, and payable semi-annually in the city of New York. The company's line of road at the date of this mortgage was constructed from Morrow to Zanesville, Ohio, but was to be extended to Dresden, Ohio. In pursuance of the resolution of the board of directors, this mortgage conveys to said trustees, or to the survivor, *in fee-simple*, all the right, title, and interest of said Valley Railway Company in and to its line of railroad from Morrow to Dresden, "with the appurtenances now completed, or to be hereafter constructed, together with all the lands, tenements, hereditaments, fixtures, buildings, cars, engines, tools and machinery, franchises, privileges, interest, and estate of the first party appertaining thereto, which the party of the first part now possesses or owns, or may hereafter acquire," in "trust for the equal benefit and security of the bond and coupon holders; with the provision that, until default shall be made in respect to something herein to be done or kept by the party of the first part, it shall be suffered and permitted to possess and operate, manage and enjoy, its said railway, with its appurtenances and appendages, and to take and use the rents, income, profits, and issues thereof, in the same manner and with the same effect as if this deed had not been made."

It further provides that, after 90 days' default by the company in the payment of interest or principal of said bonds, the trustees, or the survivor of them, on request of the holders of the one-third of the outstanding bonds, may *and shall* enter into and take possession of the mortgaged premises, hold, use, manage, and employ the same, making all needful repairs, alterations, and additions, and, after the payment of all expenses incident thereto, apply the proceeds thence arising to the *"pro rata"* payment of all principal and interest remaining due and unpaid on said bonds. It likewise contains a power of sale to be exercised by the trustees, or the survivor, at the request of one-half in amount of the bondholders, and in the event of a sale the trustees are empowered to execute a good and sufficient deed of conveyance in *fee-simple* to the purchaser of the property, and distribute the proceeds, after paying the expenses of the sale, among those entitled to the same. Then follows this provision: "And the said party of the first part hereby covenants to execute and deliver any further *suitable* conveyances that may be requisite for carrying into effect the object of those presents; *particularly* for the more *perfect assurance* of any *property* hereafter acquired by the party of the first part, and *included in the description in this deed.*"

After the execution and due registration of this mortgage, the mortgagor, said Valley Railway Company, leased and demised to the Pittsburg, Cincinnati & St. Louis Railway Company, (hereafter called, as it is most familiarly known, the "Pan-Handle Company,") for the term of 99 years from January 1, 1873, its entire line of road constructed, and to be constructed, together with all the depots, station buildings,

appurtenances, and property, real and personal, thereunto belonging and appertaining. This lease appears to have been ratified or approved by the majority stockholders of the two companies at meetings held by them, respectively, for that purpose. The lessor covenants and agrees "that the party of the second part (the lessee) shall, at all times during the term aforesaid, have full and exclusive power, right, and authority to use, manage, and work the said railway of the said party of the first part, and shall have the right to fix the tolls thereon, (but not at a higher rate than is authorized by the charter of the party of the first part.) And, further, said party of the second part shall have full, free, and exclusive right to charge and collect all of said tolls on, and freight charges and dues to accrue from, said road during said term, and to appropriate the same in the manner hereinafter mentioned, and shall have, use, exercise, and enjoy all the rights, powers, and authority aforesaid, and all other lawful powers and privileges which can or may be lawfully exercised and enjoyed, in or about the said demised railway and property, as exclusively, amply, fully, and entirely *as the same might or could have been used, exercised, and enjoyed by said party of the first part had this lease and contract not been made, and as exclusively, fully, amply, and entirely as said party of the first part have authority by law to grant the same.*"

The lessee company covenants that it will, "at all times during the hereby demised term, work, use, manage, maintain, operate, and keep in public use the railway of the party of the first part; with its appurtenances, etc., and will so work and operate said railway and appurtenances, with its equipment, as shall, in the judgment of the lessee, reasonably be required for and properly adapted to promptly and fully accommodate the business thereof, and shall and will collect and receive all of the said tolls, freight charges, and dues which shall accrue as aforesaid, and apply and appropriate the same in the way and manner following, to-wit: *First*, to maintain and repair the railway and property, and pay operating expenses, including 8 per cent. on the engines of the lessee company used on the road, and the usual charge for its cars employed thereon, premiums on insurance, and all taxes assessed against the road and property by the state or United States." Then follow these clauses:

"It being distinctly understood that certain work yet to be done, and required to perfect and completely finish the said road hereby demised, as well as such additions and improvements thereto as the parties of the second part shall determine to be necessary, from time to time, for the prompt and economical movement of the traffic on and over said road, *shall be done by and at the expense of the said first party. Second.* To pay the surplus, if any thereafter remain, to the treasurer of the party of the first part: *provided, however, that, in the event of the net earnings of the line of road hereby demised not being sufficient to protect the interest on the existing first mortgage bonds of the party of first part as it matures, the party of the second part shall advance the needful means to pay the coupons at maturity; charging any such advance over net earnings in open account, to be returned out of the subsequent earnings, and not otherwise.*"

The other general provisions of the lease, such as the requirement to keep the demised railway and property in repair, the keeping of accurate

accounts by the lessee, etc., need not be especially noticed, as they have no bearing upon the questions presented for determination. The considerations which led to this lease, the motives prompting its promoters, and the purposes sought to be accomplished by it, as disclosed in the record, need not be set out in detail. They form a curious and interesting chapter in the history of the railroad management. The means by which its ratification and confirmation was procured may be briefly referred to, as bearing upon one of the questions revived in the case.

It appears that the Pennsylvania Railway Company, a corporation of the state of Pennsylvania, in its own name, and in the name of the Pennsylvania Company, another corporation of said state, wholly in the interest of and controlled by the Pennsylvania Railway Company, *held and owned a large majority of the stock of both said lessor and lessee companies;* that said Pennsylvania Railway Company also held and owned $752,-000, or a majority in value, of said $1,500,000 first mortgage bonds of said Cincinnati & Muskingum Valley Railroad Company; that the president of said Valley Railway Company was both a director and the general counsel of the Pittsburgh, Cincinnati & St. Louis Railway Company, (the lessee;) that in June, 1872, the directors of the last-named company adopted a resolution authorizing its president to execute a lease of the Valley Railway Company to said Pittsburgh, Cincinnati & St. Louis Railway Company, in such terms and conditions as might be prepared by its *general counsel,* who was also the president of said Valley Railway Company. The lease was accordingly prepared and executed, as already set forth, and its ratification and confirmation on the part of both the lessor and lessee companies was procured by the controlling interest and influence of the Pennsylvania Railway Company, in connection and with the aid and assistance of Moran and others, who were large holders of the first mortgage bonds of said Valley Railway Company, as well as stockholders therein. The primary object and purpose of this lease, as disclosed by the whole transaction, was to obtain from the lessee, as *an advance to the lessor* over and above the net earnings of the demised railroad, the *means* with which to pay the semi-annual interest on said first mortgage bonds of the lessor, held and owned by the promoters of the scheme.

The Pan-Handle Company, (the lessee,) after taking possession of the demised road and property under the lease thus made and confirmed, expended for betterments and improvements which the lessor company agreed to make, but failed and neglected to do, the sum of $140,969, which the lessor has never refunded, and which, by reason of *its insolvency* it *is unable* to repay. It further appears that from the first of January, 1873, when the lease took effect, to the first of January, 1886, the net earnings of the demised premises, after paying operating expenses as provided by the lease, were not sufficient to protect the interest in said first mortgage bonds of the Valley Railway Company, and that the lessee, between said dates, under and in compliance with the time of clause 2, also quoted, made *advances* out of its own *means* to the lessor company of more than $1,000,000, to enable the latter to pay the inter-

v.32f.no.14—56

est coupons of its bonds as they matured. This large advance by the lessee to the lessor over the net earnings of the road, by the terms of the lease, is "*to be returned out of the subsequent earnings,* [of the demised railroad,] *and not otherwise.*" It has not been refunded to the lessee, and cannot be, either from that source or other assets of the lessor; the latter being insolvent, and the leased road being unable to earn such an amount after paying operating expenses and keeping the railway in repair.

In this condition of affairs, with the means of the lessee company being constantly diverted in making advances to the lessor, to enable the latter to meet the interest on its bonds, to the serious injury and detriment of the lessee and its stockholders, certain stockholders of the Pan-Handle Company, representing about 6,870 shares of the capital stock of said company, in April or May, 1885, made a written request and application to the president and directors of the said Pittsburgh, Cincinnati & St. Louis Railway Company (the lessee company) to take steps by legal proceedings or otherwise to cancel and terminate said lease.

Said board of directors, by formal resolution, refused to comply with this request and demand. Thereupon said stockholders, consisting of Samuel Jeans and the trustees of several Ohio townships and city of Steubenville, on the twentieth day of June, 1885, filed their bill or petition in the court of common pleas of Jefferson county, Ohio, against said Pittsburgh, Cincinnati & St. Louis Railway Company and the Cincinnati & Muskingum Valley Company, (the lessor and lessee in said lease,) praying, on behalf of themselves and other minority stockholders in interest with petitioners, that said lease and agreement may be declared null and void, and canceled, and all further operation thereunder, by either party, enjoined; and especially that the Pittsburgh, Cincinnati & St. Louis Railway Company be perpetually restrained from using the funds of said company to make any further advances for interest on the bonds of the lessor, for the operation and maintenance of said leased road or otherwise, under said lease, and that the Cincinnati & Muskingum Valley Company be enjoined from attempting to enforce said lease, etc.

The general grounds on which petitioners asked this relief were that said contract of lease, in its terms and operation, was a hard, oppressive, and unconscionable agreement, and a fraud upon the rights of plaintiffs; that the lessee could derive no profit therefrom, in any event, as the net earnings were to be turned over to the lessor company, which left the lessee's agreement to advance the means needed to pay the lessor's interest wholly without consideration; that the earnings of the road were entirely insufficient to supply the funds required to meet that interest; that the lessee company had already paid out large sums for improvements which the lessee was bound to make, and in the way of advancements to the lessor to pay the interest on its bonds, which the lessor could not reimburse; that the lessor could not comply with its covenants, which formed the consideration of the lessee's undertakings; that the influence and means by which said lease was brought about, executed, and accepted constituted a fraud upon plaintiffs and other minority stockholders in said lessee company; that the Pennsylvania Railway Company, in

connection with the Pennsylvania Company, which it controlled, owned a large majority of the stock in both said lessee and lessor companies, and with this controlling interest and influence, was able to ratify said lease; that it had been requested to cancel and annul said lease, but refused to take any steps in that direction; that the plaintiff Samuel Jeans, when the lease was submitted to the stockholders of the lessee company for approval, had entered his written protest against its execution, but had no knowledge of the adverse interest so controlling and causing said lease to be executed until about April 1, 1885; and that the other plaintiffs had never approved said lease, and had no knowledge or information of the circumstances under which it was executed, or of the adverse interests so controlling and causing it to be executed, until April, 1885. The lease was made an exhibit to the bill.

The defendants were regularly served with process. On the seventeenth day of July, 1885, the Cincinnati & Muskingum Valley Railway Company appeared by counsel, and *demurred* to the petition. The other defendants, the Pittsburgh, Cincinnati & St. Louis Railway Company, appeared August 17, 1885, and answered the petition. On the twenty-fourth November, 1885, the demurrer of the Valley Railway Company was overruled by the court, to which said defendants excepted, and, failing to plead further, the cause was further heard, and submitted to the court "*upon the pleadings and evidence, and the court, being fully advised in the premises,*" found the allegations of the petition were true, and that plaintiffs were entitled to the relief prayed for, and thereupon adjudged and decreed that said lease be vacated, set aside, and declared null and void. It was further decreed "that on or before January 1, 1886, the said Pittsburgh, Cincinnati & St. Louis Railway Company surrender and deliver up to the Cincinnati & Muskingum Valley Railway Company the said demised railway and property in as good order and repair as when received by the lessee. Said lessee company was perpetually enjoined and restrained from operating said leased road under said lease, and the lessor company, the Cincinnati & Muskingum Valley Railway Company, was also perpetually enjoined from enforcing, or attempting to enforce, said lease and contract against said lessee, who was, however, directed by the decree to pay or advance the sum of $52,500, the amount needed by the lessor to meet the interest on its bonds falling due July 1, 1885. From this decree neither of said defendants appealed.

*On the tenth December, 1885,* during said term of the court at which said decree was rendered, one Evan J. Henry was, upon his motion, made a party defendant in said cause, and allowed to file his answer therein, which he *did for himself* and other stockholders of the Cincinnati & Muskingum Valley Railway Company who might unite with him in the defense of said suit. In his answer, Henry insisted upon the validity of the lease. No action appears to have been taken thereon, nor was any new decree entered in the cause. But on the fourteenth day of December, 1885, said Henry filed an appeal-bond in the case, the condition of which recited "that whereas, the said Evan J. Henry has taken an *appeal from a certain judgment and decree rendered against him, in favor of the said Pitts-*

*burgh, Cincinnati & St. Louis Railway Co., and others interested,* in the court of common pleas, within and for the county of Jefferson, in the state of Ohio, at the October term of A. D. 1885, to the circuit court within and for the county aforesaid," etc.   At the May term, 1886, of *said circuit court* said appeal was, on motion, dismissed; whereupon said Henry tendered his bill of exceptions, which being allowed, he presented his petition in error to the supreme court of Ohio, where the same is now pending.

In pursuance of said decree, the Pittsburgh, Cincinnati & St. Louis Railway Company, as lessee as aforesaid, on the first day of January, 1886, surrendered and delivered up the possession of said demised railway and property to the lessor, the said Cincinnati & Muskingum Valley Railway Company, which has since had full control of the same.

Charles Moran, the surviving trustee of the mortgage made by the Cincinnati & Muskingum Valley Railway Company, to secure its first mortgage bonds, knew of the pendency of this suit of Samuel Jeans *et al.* to annul said lease, but took no steps to intervene therein or defend the same.

The Cincinnati & Muskingum Valley Railway Company having made default in the payment of the interest on the bonds falling due July 1, 1885, and the aforesaid suit of "Samuel Jeans *et al.*" being then pending in the state court to cancel and annul said lease, the said Charles Moran, as surviving trustee under the aforesaid mortgage, on September 9, 1885, filed his bill in this court against the said Valley Railway Company, the mortgagor, the Pittsburgh, Cincinnati & St. Louis Railway Company, and the several plaintiffs in the action brought in the Jefferson common pleas, alleging that, as mortgagee, he was entitled to have said mortgage of September 1, 1870, foreclosed; that he was entitled to have the aforesaid lease, with the covenants therein contained, enforced against the lessee company for the use and benefit of the bondholders of the lessor company; and that said suit of Samuel Jeans *et al.* against said two railway companies was a collusive scheme, instigated and put in force by the lessee company, etc., to terminate said lease, and thus defeat the rights of the lessor's bondholders whom he, as trustee under the mortgage, represented, etc.   The complainant then prays "for the appointment of a receiver to take possession of and collect the rental aforesaid, payable by the Pittsburgh, Cincinnati & St. Louis Ry. Co. to the Cincinnati & Muskingum Valley Railway Company, under and by virtue of the provisions of said lease, during the pendency of this suit, and that *upon final decree it may be held and established,* notwithstanding said collusive suit, and anything done therein; *that the said lease and contract in equity belong and appertain to the holders of said mortgage bonds,* and to this plaintiff, as their trustee, *as a muniment and part of their title; and that said lease and contract are valid; and that said holders and this complainant are entitled to enforce the same, and collect said rents as security for said bonds; and that all the estate and reversion of the lessor in said railway property, with the benefit of the lease aforesaid, and the right to receive the rents accruing upon said lease, and to enforce the performance of its covenants, may be sold and dis-*

*posed of by a master commissioner to be appointed by this court, but without dispossessing the said lessee company of its possession, or any of its rights under said lease;* and for such other and further relief as in equity complainant may prove to be entitled to."

The mortgagor having made default in the payment of the interest falling due January 1, 1886, the complainant filed an amended and supplemental bill, asking for a decree therein; and after non-payment of the interest maturing July 1, 1886, and January 1, 1887, he filed a second amended and supplemental bill, asking that these might be included in his decree; with the further prayer in both said bills "that the defendant, the Pittsburgh, Cincinnati & St. Louis Railway Co., in addition to the relief prayed against it in the original bill, may be restrained and enjoined from asserting or pleading the pendency of the said suit in Jefferson common pleas, or the granting of the judgment therein, or any judgment that may hereafter be rendered therein, by way of defense in any action at law which may be brought upon said coupon or interest warrants, or to enforce the performance of any legal duty entered into between said railway companies;" and for general relief.

The Cincinnati & Muskingum Valley Railway Company has failed to answer, and is in default. The other defendants have separately answered both the original and supplemental bills. They set up and rely, by way of defense, upon the pendency of the action and the judgment in said Jefferson common pleas annulling said lease. They deny that said suit was collusive, or in any way fraudulent, as to complainant. They insist that said lease was procured by such fraudulent devices and breaches of trust as rendered it void or voidable by the minority stockholders of the lessee company, whose rights and interests it injuriously affected; but, whether valid or invalid, they claim that complainant has no interest in said lease, and has no right to enforce its provisions, etc. No receiver was ever appointed.

There is no question or dispute as to the right of the complainant to a decree for the foreclosure of said mortgage by the sale of the mortgagor's equity of redemption in and to the property and interests covered by the mortgage. The main ground of controversy between the litigant parties relates to the *lease.* The real and avowed purpose of this suit was to continue this lease in force against the lessee company, in favor of the bondholders or purchasers under the sale herein asked for, to the end that he or they may have and secure the benefit of the *lessee's covenants to make advances* beyond the net earnings of the road *sufficient to pay* the interest on the bonds as it matures, *and look alone to the earnings of the demised railway for its reimbursement of such advances.*

This relief is sought, while at the same time the court is asked to sell, and thereby terminate the estate of the lessor, (which supports the lease.) Can these two things, as rights or remedies, co-exist? The trust created by the mortgage will be fully executed when the foreclosure is completed as against the mortgagors. The purchaser of the mortgaged property will not hold the same either *as bondholders,* or *for the benefit of bondholders, who can look alone* to the proceeds of sale. Can the court sell and as-

sign and cause to be transferred to such purchaser at foreclosure sale, and to be held for his own benefit, this *covenant* of the lessee to make advances of sums sufficient to pay interest on a debt which has ceased by foreclosure to be *a trust* against the property? Can the court compel the lessee company to advance to the purchaser under foreclosure sale, semi-annually, sums equal in amount to the interest on the bonds, when by the act of foreclosure the mortgagor has *become legally extinct*, or when its right to exist and exercise corporate franchises has not only ceased, but, by decree, has passed to another? In other words, when there will no longer be any mortgagor, any lessor, any bondholder, as such; when the trust on the property in favor of such bondholder, will have ceased,—can this court keep alive for 99 years, in favor of the purchaser under its foreclosure decree, the lessee's covenant to make *advances* semi-annually of interest on a debt that has either become extinct, or never passed to such purchaser? But, ahead of these difficulties, there is presented the question whether the complainant can, under the mortgage to him or otherwise, assert any right in or under said lease, or is entitled to have its existence maintained, and its provisions enforced for the benefit of the bondholders whom he represents. In other words, can that lease be brought within the description of the property, rights, and interests then existing or after-acquired, which were embraced in or covered by the mortgage executed to complainants? These questions have been elaborately and most ingeniously argued by the distinguished counsel for complainant. It is not deemed necessary to review that argument in detail. It has been fully and carefully examined by the court, in connection with the able briefs submitted on the part of the counsel for defendants. And as the result of its investigation the court's conclusions are as follows, viz.:

1. That, said lease having been executed *subsequent* to the mortgage, no *privity of estate or contract was thereby created* between the mortgagee and lessee. It is the well-settled rule in this country and in England that, inasmuch as *no reversion* vests in the mortgagee under such circumstances, he cannot distrain or bring an action, either at law or in equity, for the rents payable by the tenant, nor is he entitled to enforce the covenants and provisions of the lease. He has no election, either before or after the mortgagor's default, to adopt and demand the benefits of the lease without the consent of the lessee. His remedy is to foreclose upon default of the mortgagor, or to take possession of the premises, and thereby place himself in position to obtain the future profits. Either step operates as an eviction of the tenant by title paramount, and leaves him at liberty to terminate the lease and quit. See *Teal* v. *Walker*, 111 U. S. 242, 4 Sup. Ct. Rep. 420, and cases cited; *Thompson* v. *Somerville*, 16 Barb. 469; *Simers* v. *Saltus*, 3 Denio, 214; *Lane* v. *King*, 8 Wend. 584; *Burr* v. *Stanton*, 52 Barb. 377; *Austin* v. *Ahearne*, 61 N. Y. 6; *Magill* v. *Hinsdale*, 6 Conn. 469; Hil. Mortg. 207; Cook, Mortg. 402; Jones, Mortg. (3d Ed.) §§ 776–778; Tayl. Landl. & Ten. §§ 121–125; *Rogers* v. *Humphreys*, 4 Adol. & E. 299–313; *Partington* v. *Woodcock*, 6 Adol. & E. 690; Rawle, Cov. (3d Ed.) 265; *McKircher* v. *Hawley*, 16 Johns. 289; *Price* v. *Smith*, 1 Green, Ch. 516.

2. That under the facts of this case there has been no attornment, actual or constructive, nor any "equitable equivalent" therefor, by the lessee to the mortgagee, so as to change the above rule; and this court has no power to compel such an attornment by the lessee, either to the mortgagee or the purchaser under the foreclosure proceedings. The relation of landlord and tenant, as between the mortgagee and lessee, can only arise by the mutual agreement and consent of the parties. See authorities above cited.

3. The lease in question does not come within the description of the property, rights, or franchise covered by the mortgage, nor is it in any sense "after-acquired property," within the meaning of these terms as used in said mortgage. Even if the income, rents, and profits of the road had been covered by the mortgage, the personal covenant of the lessee to make "*advances*" as provided in the lease could not be treated as "income" of the road, or as a part of the "purchase" of the mortgage. The subject of "after-acquired property," under mortgages containing similar provisions and clauses as the present, has often been before the supreme court, but no case yet decided has gone to the extent of holding that personal contracts or covenants entered into with the mortgagor, and under which no new estate is acquired by the mortgagor, come within these terms. See *Railway Co.* v. *U. S.*, 112 U. S. 733, 5 Sup. Ct. Rep. 366; *Shaw* v. *Bill*, 95 U. S. 110; *State* v. *McCullough*, 104 U. S. 25; *Calhoun* v. *Railroad Co.*, 2 Flip. 442.

4. But if the lease were otherwise free from objection, if it were still in force as between lessor and lessee, and if it came within the description of the property, rights, and franchises covered by the mortgage, so that complainant had precisely the same right to claim the benefit of its provisions which the mortgagor had, (and certainly his rights could in no event rise higher than the mortgagors,) still this court would not compel the lessee to specifically perform the provisions of said lease, or enforce the lessee's covenant to make advances, beyond the net earnings of the demised road, sufficient to pay the interest on the lessor's bonds, and leave it to look alone to the future earnings of an insolvent road for its reimbursement; *because* the enforcement of that agreement would be grossly inequitable, unreasonable, hard, and oppressive on the lessee, and without any equivalent consideration, past, present, or prospective; and *because* the lessor, to whose rights the complainant claims to have succeeded, *is in default for large sums due the* lessee, and which the complainant makes no offer to pay. The mortgagee not being a party to, or interested in, or entitled to, the benefits of said lease, and the covenants therein contained; and the lessee, having never attorned to him, was not a necessary party to the suit of Samuel Jeans *et al.* in Jefferson common pleas for the cancellation and annulment of said lease. The decree in that suit is conclusive on the parties to the lease, the lessor and lessee, and it is wholly immaterial whether it was instituted at their suggestion or not. The lessor and lessee could themselves have vacated and terminated said lease by mutual agreement at any time.

Other questions, such as fraud in procuring the execution and ratifi-

cation of said lease, and want of authority or power on the part of the lessee company to enter into any binding agreement to make *advances* from its own funds to the lessor, to enable the lessor to meet the the interest on its bonds, have been discussed by counsel, but their determination is not necessary, in view of the conclusions which the court has reached on the foregoing points.

The case of *Railway Co.* v. *Railway Co.*, 8 Biss. 456, on which complainant's counsel relies with much confidence, does not, when carefully examined and analyzed, support the complainant's claim, or conflict with the conclusion here reached.

The complainant being entitled to *no* relief in respect to said lease, his original and amended and supplemental bills, as against the Pittsburgh, Cincinnati & St. Louis Railway Company, Samuel Jeans, and all defendants other than the Cincinnati & Muskingum Valley Railway Company, should be dismissed with costs, and it is accordingly so ordered and decreed. The complainant being entitled to a decree of foreclosure and sale as against the mortgagor, the Cincinnati & Muskingum Valley Railway Company, such a decree is accordingly ordered on the usual terms.