### WESTERN UNION TEL. CO. v. ANN ARBOR R. CO.

(Circuit Court of Appeals, Sixth Circuit. November 9, 1898.)

#### No. 524.

1. MORTGAGES—RIGHTS GRANTED IN THE PROPERTY BY MORTGAGOR.

Under the general law governing mortgages in this country, a mortgagor is entitled to possession until condition broken, and during such time may lease and deal with the property in all respects as owner, subject, however, to the rights of the mortgagee, upon whose entry into possession all rights granted by the mortgagor cease and determine; the contracts by which such rights are granted, whether of tenancy or of an easement, being no longer of force as against the mortgagee, nor binding upon the grantees.

2. SAME—EFFECT OF FORECLOSURE—STATE STATUTE.

The statute of Michigan (2 How. Ann. St. § 7847) providing that no action of ejectment shall be maintained by a mortgagee or his assigns or representatives for the recovery of the mortgaged premises until the title thereto shall have become absolute on a foreclosure of the mortgage merely takes away the remedy of the mortgagee by entry or ejectment, and does not in any way affect his rights against those claiming an interest in the premises under the mortgagor, which are devested by the taking of possession after foreclosure the same as by entry at common law; and it is not necessary, to that end, that a tenant or the holder of an easement should have been made a party to the foreclosure.

3. TELEGRAPHS—RIGHT TO OCCUPY RAILROAD RIGHT OF WAY—EFFECT OF ACT OF CONGRESS.

The act of July 24, 1866 (Rev. St. §§ 5263, 5268, 5269), authorizing telegraph companies complying with its terms to construct and maintain their lines along and over all post roads of the United States; and Rev. St. § 3964, making all railroads post roads,—do not give a telegraph company the right to occupy the right of way of a railroad with its line without its consent, or a contract with a prior owner which is binding upon it.

4. SAME—RIGHT OF WAY—POWERS OF COURT OF EQUITY.

A court of equity has no power, on the ground of public necessity, to effect an equitable condemnation of an easement of way for a telegraph line over the right of way of a railroad, on which it was built and operated

under a contract with a prior owner of the road, which has been terminated by the sale of the road on foreclosure of a mortgage antedating such contract.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

This was a bill in equity by the Western Union Telegraph Company—First, to restrain the defendant, the Ann Arbor Railroad Company, from interfering with the telegraph wires and poles of the complainant, running from Thompsonville to Frankfort, on the line of the defendant's railroad; second, to compel the defendant to allow the complainant to reconnect the wires to the complainant's main line on the Chicago & Western Michigan Railroad, and to use the wires for its telegraph business as they were used before they were disconnected by the defendant; and, third, to require the defendant to carry out the contract under which said poles and wires were erected, made by the Western Union Telegraph Company with the Frankfort & Southeastern Railroad Company, a former owner of this part of defendant's line of railway. The complainant relies, in its bill, not only upon the contract made with the Frankfort & Southeastern Railroad Company, as binding upon the defendant, but also upon the provisions of the act of congress passed July 24, 1866, the provisions of which the complainant company accepted, and which, the bill avers, confer a right upon the complainant to maintain its telegraph line on the railroad as a post road of the United States.

The defendant answered, setting forth the circumstances under which it acquired title; and, after replication, the case was heard on the following agreed statement of facts: That on March 1, 1889, the said the Frankfort & Southeastern Railroad Company executed a mortgage upon all its property and assets, of every kind and description, whether then owned or thereafter to be acquired by said company, to Henry Day and Albert C. Hall, as trustees, which mortgage was thereupon, to wit, on the 11th day of May, 1889, duly recorded in the counties through which the road passed; that the road was sold by the mortgagor to the Toledo, Ann Arbor & North Michigan Railway Company; that subsequent mortgages were issued by the grantee company, and there was a default upon all the mortgages, including the one first above mentioned, and foreclosure proceedings were begun upon all of them; that the railroad here in question was sold at foreclosure sale under the mortgage of March 1, 1889, to the trustees under said mortgage, from whom, by mesne conveyance, the title was transferred to the defendant, the Ann Arbor Railroad Company; that the complainant was not a party to these foreclosure suits; that the contract between the complainant and the Frankfort & Southeastern Railroad Company was entered into on the 25th day of September, 1890, more than a year after the execution of the mortgage, to Day and Hall, trustees; that Day and Hall, trustees, knew of the contract and complainant's claim of right under it before foreclosure; that the Ann Arbor Railroad Company was delivered possession of the railroad by the order of the court in the foreclosure proceedings; and that, after notice to the complainant, it declined to recognize any obligation upon it arising from complainant's contract with the Frankfort & Southeastern Railroad Company, and disconnected the wires, as averred in the bill. By complainant's contract with the Frankfort & Southeastern Railroad Company, the latter agreed to furnish and distribute for the telegraph company, free of cost, along the line of the railroad, cedar poles, 30 to a mile, to furnish all the labor to dig the holes in which to set the poles, to place the wires and insulators thereon, under the direction of a foreman of the telegraph company, to maintain the poles and wires at its own expense in good order and repair, and to reconstruct them when required by the telegraph company. The telegraph company agreed to furnish the wires and insulators for the entire line, and the necessary batteries. The railroad company agreed to furnish, free of charge, in its station houses, suitable space for batteries. The telegraph company agreed to set apart the first wire erected along said railroad for the joint use of the parties to the contract for the transmission of railroad and commercial telegraph business. By the fourth section it was agreed that either party might establish telegraph stations at such places as it might deem necessary; that the telegraph com-

pany should furnish the instruments; that the railroad company should furnish the operators, and all messages pertaining to the railroad business should be transmitted free. The railroad company agreed to transport, free of charge, all officers and employés and all material for the use of the telegraph company, and, if the telegraph company elected to establish an independent office at a station of the railroad company, the railroad company agreed to furnish office room, light, and fuel free of charge in such station. The eighth section was as follows: "Eighth. The railroad company, so far as it legally may, hereby grants and agrees to assure to the telegraph company the exclusive right of way on, along, and under the line, lands, and bridges of the railroad company, and any extensions and branches thereof, for the construction, maintenance, operation, and use of lines of poles and wires and underground or other lines for commercial or public uses or business, with the right to put up or construct, or cause to be put up or constructed, from time to time, such additional lines of poles and wires and underground or other lines as the telegraph company may deem expedient; and the railroad company agrees to clear, and keep clear, said right of way of all trees, undergrowth, and other obstructions to the construction and maintenance of the lines and wires provided for herein; and the railroad company will not transport men or material for the construction, maintenance, or operation of a line of poles and wire or wires or underground or other lines in competition with the lines of the telegraph company, party hereto, except at and for the railroad company's regular local rates, nor will it furnish for any competing lines any facilities or assistance that it may lawfully withhold, nor stop its trains, nor distribute material therefor at other than regular stations: Provided always that, in protecting and defending the exclusive grants conveyed by this contract, the telegraph company may use and proceed in the name of the railroad company, but shall indemnify, and save harmless the railroad company from any and all damages, costs, charges, and legal expenses incurred therein or thereby." By the eleventh section it was "mutually understood and agreed that the telegraph line, poles, wires, and fixtures covered by the contract shall be the property of the telegraph company, and shall form part of its general telegraph system, and shall be controlled and regulated by the telegraph company, which shall fix and determine all tariffs for the transmission of messages and all connections with other lines and interests." By the twelfth section the provisions of the agreement were extended to all railroads then owned, leased, controlled, or operated by the Frankfort & Southeastern Company, and to all railroads thereafter owned, leased, controlled, or operated by that company, or by any company or corporation in which that company might own a majority of the stock, or whose action it might be able to control by ownership of stock or otherwise. The provisions of the contract, it was stipulated, should be and continue in force for and during the term of 25 years from the 25th day of September, 1890, and should continue after the close of the term, until the expiration of one year after written notice should have been given after the close of the term, by either party to the other, of an intention to terminate the same.

The circuit court held that the contract was in all respects, except in so far as it purported to create an easement in the real estate in the nature of a right of way, a contract personal to the Frankfort & Southeastern Railroad Company; that the burden of that contract did not pass to and become a charge upon the defendant in this case upon its purchase under the foreclosure of the mortgage or mortgages upon the Frankfort & Southeastern Railroad Company's lands and property, unless by some conduct the Ann Arbor Railroad could be held to have adopted the contract as its own, and that no such conduct was proven in the case; that, in respect of the right of way,—a supposed easement affecting the real estate, and which, it was claimed, created rights outlasting the continuance of the personal covenants in the contract,—the right to the easement ceased with the continuance of the personal covenants, and had no foundation upon which it could last independently of the personal covenants; and, further, that, this being so, the parties, in the making of the original contract, knowing, as they must be presumed to know, that this would be the natural consequence, must be held to have intended

that the easement should not continue for the term stated, unless the principal things contemplated by the contract should continue to endure, and require, in order to give them effect, that the easement should also continue; that no foreclosure was necessary; that the easement had ceased; that the telegraph company had the right to remove the personal property, which, by the terms of the contract, were to inure to and belong to it; and that it had, under the circumstances attending the entry of the present railroad company upon the lands and property of the Frankfort & Southeastern Railroad Company, an implied license to enter upon the property, and remove the same. The bill of the complainant was accordingly dismissed.

Rush Taggart and C. A. Kent, for appellant.

Alex L. Smith, for appellee.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

TAFT, Circuit Judge (after stating the facts). Had the mortgage of the Frankfort & Southeastern Railroad Company the character and incidents of a mortgage at common law, it cannot be doubted that, by the entry upon the premises of the assignee of the mortgage, all rights of the telegraph company under its contract would have ceased, and its attempt to continue the enjoyment of the easement said to have been created thereby would have been nothing but a trespass. In England, at the common law, title and right of possession passed to the mortgagee at once upon the execution of the mortgage, and, if the mortgagor remained in possession, he was not more than a tenant at will. He could not bind the mortgagee by any contract or grant with reference to the land mortgaged, and any one entering by his license, lease, or grant was, as to the mortgagee, only a trespasser, whom the latter might enter upon and oust, or against whom he might bring ejectment, without notice to quit.

In Keech v. Hall, 1 Doug. 21, a mortgagor in possession had, after the mortgage, made a lease in writing for seven years. The mortgagee brought ejectment against the lessee of the mortgagor, without giving him notice to quit, and had judgment. Lord Mansfield said:

"When the mortgagor is left in possession, the true inference to be drawn is an agreement that he shall possess the premises at will, in the strictest sense; and therefore no notice is ever given him to quit, and he is not entitled to reap the crop, as other tenants at will are, because all is liable to the debt, on payment of which the mortgagor's title ceases. The mortgagor has no power, express or implied, to let leases not subject to every circumstance of the mortgage."

The law, even of those states of this country where no change has been made by statute, is more liberal to the mortgagor. Until condition broken, though the title passes to the mortgagee, he holds it merely as security, and not until after a breach has he the right to enter upon the mortgagor, or to maintain ejectment against him. The mortgagor has a right to lease, sell, and in every respect to deal with the mortgaged premises as owner, so long as he is permitted to remain in possession, and so long as it is understood that every person taking under him takes subject to all the rights of the mortgagee, unimpaired and unaffected. 4 Kent, Comm. 157. It is, however, well settled that no contract of lease, which the mortgagor may make with respect to the land, either inures to the benefit of the mortgagee, or is

binding on him. There is in such case no privity of either estate or contract between the mortgagee and the lessee of the mortgagor to bind either, and the entry of the mortgagee into possession under the mortgage merely avoids the lease, and releases the lessee from any obligation. Moran v. Railway Co., 32 Fed. 878, 886; Teal v. Walker, 111 U. S. 242, 248, 4 Sup. Ct. 420. Under this general doctrine, it cannot be doubted that, in the case at bar, the entry of the mortgagee or his grantee into possession would have avoided all the telegraph company's rights, and that its alleged easement granted for 25 years would be at an end. The grantee of an easement for 25 years certainly stands upon no higher ground than a lessee for such a term. Indeed, his position is not so good in this case. A lessee has possession of all the land mortgaged, and may, perhaps, be said to have acquired pro tanto the equity of redemption and an estate in the land. The holder of this easement, which can only be enjoyed in connection with certain personal covenants certainly not binding on the mortgagee, has no possession of the land mortgaged in any proper sense, but merely a right in alieno solo against the mortgagor. If, therefore, an entry of the mortgagee upon the lessee would avoid his interest in the land, a fortiori would it end the interest of one who holds from the mortgagor nothing but a naked right in the nature of an easement in gross and incapable of enjoyment, except upon terms in no wise binding upon the mortgagee.

The question which remains for our consideration is whether, in Michigan, where this railroad lies, the character of a mortgage differs so widely from that of mortgages in other states that the result of the law of mortgages in other states would not obtain there. It is provided by statute in Michigan (2 How. Ann. St. § 7847) that no action of ejectment shall be maintained by a mortgagee or his assigns or representatives for the recovery of the mortgaged premises until the title thereto shall have become absolute upon a foreclosure of the mortgage. The effect of this statute is merely to take away the remedy of the mortgagee by entry or ejectment, but it does not in any way affect his rights against those claiming an interest in the premises under the mortgagor. The rule that the mortgagor cannot bind the mortgagee by lease or other contract is not changed thereby. When the mortgagee acquires possession of the mortgaged land by foreclosure sale, the effect of his possession upon those claiming under the mortgagor is just as complete to avoid their rights and interest as was entry or ejectment at common law. Nor does it prevent this result that the holder of the easement may not have been made a party to the foreclosure suit. The easement was granted subject to being devested by the mortgagee's acquiring possession of the mortgaged premises. That event has happened, and the devesting follows. Of course, if the telegraph company had been made a party to the foreclosure, the decree would have settled the rights of the purchaser as against the telegraph company as res judicata, and would have conclusively established that the company had no interest in the land after sale. As the company was not a party to the decree, however, the divestiture of its right must be shown by proof of the execution of the mortgage prior to the contract for the easement, and the entry into possession by the mortgagee or his assignee under

foreclosure and sale. We have found no Michigan authority in point upon this question, but, in other states having statutes like the one from Michigan above quoted, the conclusion we have reached is well sustained by adjúdicated cases.

In Iowa, by statute, the mortgagor retains the legal title and the right of possession until foreclosure and sale. Code Iowa 1873, p. 357; Jones, Mortg. § 29. In Downard v. Groff, 40 Iowa, 597, A. sued G. on a covenant of general warranty. G. was the assignee of a mortgage, and at foreclosure bought in the property, and sold with warranty to A. The breach assigned was that D., the mortgagor, after the execution of the mortgage, had leased the land to one L., and that L., who had not been made a party to the foreclosure proceeding, had refused to yield possession, and had taken the crops growing at the time of the sale. It was held that no breach was shown, because the purchaser had the right to evict L., and to take the emblements. The court said:

"It may be conceded that since Leroy, the tenant, was in possession under a lease from the mortgagor, and was not made a party to the foreclosure suit, that he is not bound or affected by the judgment therein. But this fact does not alter the rights of the mortgagee, or of the purchaser under the foreclosure sale, as against such tenant. It only affects the remedy, and defeats the use of the judgment as evidence. By the lease from Dorstal, the mortgagor, to Leroy, the latter acquired no greater rights in the premises than the mortgagor had. The tenant stands exactly in the situation of the mortgagor. As between the mortgagor and mortgagee, the latter, by the foreclosure and sale, became entitled to the possession of the premises, and to all the crops then growing thereon. This right of the purchaser was not and could not be defeated by reason of the lease, or by the fact that the possession was in, or that the crops were grown by, the lessee. The right to the possession, and the right to the growing crops, passed to the purchaser. If the tenant had been made a party to the foreclosure suit, the possession and the crops could have been delivered to him by process under that judgment; but, since he was not made a party thereto, he cannot obtain that remedy except by some other action. The purchaser's rights, however, are just the same as they would have been if the tenant had been made a party. It follows, therefore, that Groff, by his purchase and sheriff's deed, became the absolute owner of the premises, including the crops growing thereon; and by his conveyance he invested the plaintiff herein with that ownership, and she might, by proper action, have enforced her rights as such owner against the tenant. Her failure to do so cannot give her any cause of action against the defendant, her grantor."

In California the title and right of possession of the mortgagor continues until foreclosure and sale. McMillan v. Richards, 9 Cal. 365; 1 Jones, Mortg. § 20. In McDermott v. Burke, 16 Cal. 580, the action was ejectment by the purchaser at a mortgage foreclosure sale against the lessees under a term of five years, granted by the mortgagor after the execution of the mortgage. The lessees had not been made parties to the foreclosure suit. Chief Justice Field, who had delivered the opinion in McMillan v. Richards, supra, also delivered the judgment of the court in this case. He said:

"We are of opinion that the legal rights of the lessee were extinguished by the proceedings in the foreclosure suit and sale following the decree thereon. A mortgagor cannot make a lease which will bind his mortgagee, where the lessee at the time had notice of the mortgage, either actual or constructive. The interest of the lessee in such case is dependent for its duration, except as limited by the terms of the lease, upon the enforcement of the mort-

gage. So long as the mortgage remains unenforced, the lease is valid against the mortgagor, and in this state against the mortgagee; but with its enforcement the leasehold interest is determined. There is no privity of contract or of estate between the purchaser upon the decree of sale and the tenant. The purchaser may therefore treat the tenant as an occupant without right, and maintain ejectment for the premises. He cannot, for the want of such privity, count upon the lease, and sue for the rent or the value of the use and occupation. The relation between the purchaser and tenant is that of owner and trespasser until some agreement, express or implied, is made between them with reference to the occupation. Until then, both are equally free from any contract obligations to each other. The tenant is not bound to attorn to the purchaser, nor is the latter bound to accept the attornment, if offered. The purchaser may prefer to have the possession, and the tenant may also prefer to surrender it. * * * The error of the plaintiff arises from the misapprehension of the rule as to the parties necessary to the foreclosure of a mortgage. The rule only requires, as parties, those who are beneficially interested in the claim secured or in the estate mortgaged. The tenant is not thus interested in the claim. He is not entitled to its proceeds when collected, or to any portion of the proceeds. Nor is he thus interested in the estate mortgaged; that is, in the title which is pledged as security. He has not succeeded to such estate, or to any portion of such estate. He does not stand, therefore, in the position of a purchaser. The estate remains in his lessor. He has only a contingent right to enjoy the premises. The right of the lessor to the possession ends with the sale of the premises, or, rather, with the deed by which the sale is consummated. The right of the tenant to such possession depends upon that of the lessor, and goes with it."

In New York no action of ejectment can be sustained by a mortgagee for the recovery of the mortgaged premises, and the mortgagor has a right to sell or lease subject to the rights of the mortgagee. In Simers v. Saltus, 3 Denio, 214, the suit was by the mortgagor on a covenant of a lease for rent. The defense was eviction. The facts were that the lessor, being the owner in fee of the land, had given a mortgage upon the same before he made the lease upon which suit was brought, and that the mortgagee had foreclosed the property, and brought it to a sale; that the purchaser had said to the tenant that he might continue to occupy the land, and the contention was that, by such consent, the lessee continued bound under the lease. The court held, however, that, by the foreclosure and sale, the lease of the tenant had been extinguished. The court said:

"If the mortgagor, subsequent to the mortgage, lease the premises, the mortgagee cannot distrain or sue for the rent, because there is no privity of contract or of estate between the mortgagee and tenant, unless the tenant attorn to the mortgagee after the mortgage has become forfeited, which he may do. * * * After foreclosure and sale of the mortgaged premises, in possession of a lessee of a mortgagor, under a lease subsequent to the mortgage, the lessee is considered a wrongdoer, and is not entitled to notice to quit; and against him an action of trespass will lie by the purchaser for taking and carrying away the crops. Lane v. King, 8 Wend. 584."

The same principle is laid down in Indiana, a state which has the same statutory provisions in respect to the remedies of the mortgagee as Michigan. Jones v. Thomas, 8 Blackf. 428. It is true that in Lockhart v. Ward, 45 Tex. 227, it was held by a majority of the court (the chief justice dissenting) that ejectment would not lie in favor of a mortgagee purchasing at the foreclosure sale against the lessee of a mortgagor, who had not been made a party to the foreclosure proceedings; but the weight of authority is to the contrary, as we have seen. A tenant for years under a mortgagor, when evicted by the

mortgagee before or after foreclosure, may redeem the mortgage. Averill v. Taylor, 8 N. Y. 44; Bacon v. Bowdoin, 22 Pick. 401. And it is possible that the grantee of such an easement as this one claimed at the bar might be accorded the same privilege; but, however that may be, in the absence of redemption the right to enjoy the easement ended with the entry of the purchaser at foreclosure sale. The complainant company had no right to object, therefore, when the purchaser refused to permit it to enjoy the easement longer, and disconnected the wires; and the prayer for an injunction against such acts was rightly denied. The defendant railroad company conceded all that was claimed by the complainant in respect to the personal property and fixtures under clause 11 of the contract, and no controversy arises thereon.

It is contended, further, that the telegraph company may continue to maintain a telegraph line over defendant's railroad without its consent, by virtue of the act of congress passed July 24, 1866 (Rev. St. §§ 5263, 5268, 5269). By this act it is provided that any telegraph company organized under the laws of any state shall have the right to construct, maintain, and operate lines of telegraph over and along any of the post roads of the United States, after filing a written acceptance of the obligations and restrictions of the act. By section 3964, Rev. St., passed in 1872, all railroads or parts of railroads in the United States are established as post roads. In Pensacola Tel. Co. v. W. U. Tel. Co., 96 U. S. 1, 11, it was held that the purpose of this legislation was to secure the convenient transmission of intelligence by telegraph in the United States from state to state without state interference, and that it was a legitimate regulation of interstate commerce by congress. Speaking of the act, the court said:

"It gives no foreign corporation the right to enter upon private property, without the consent of the owner, and erect the necessary structures for its business; but it does provide that, whenever the consent of the owner is obtained, no state legislation shall prevent the occupation of post roads for telegraph purposes by such corporations as are willing to avail themselves of its privileges."

Again, the court said:

"No question arises as to the authority of congress to provide for the appropriation of private property to the uses of the telegraph, for no such attempt has been made. * * * If private property is required, it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized."

The authority establishes, if authority were needed, that the telegraph company cannot occupy the line of defendant's railroad without the consent of defendant, or the consent of some predecessor in title, which is binding on the defendant. This, we have seen, is wanting. The suggestion, however, seems to be, if we understand it, that, because of the public necessities, the court ought to use its injunction process and shape its decree so as to effect an equitable condemnation of the easement of way. The court has no such power.

The decree of the circuit court is affirmed, with costs.