WESTERN UNION TELEGRAPH CO. v. GEORGIA R. & BANKING CO. et al.

(District Court, S. D. Georgia.    October 11, 1915.)

1. TELEGRAPHS AND TELEPHONES ⬥⟲11—CONSTRUCTION OVER RAILROAD RIGHT OF WAY—EASEMENT.

Under Civ. Code Ga. 1910, § 3645, which provides that "a parol license * * * is not revocable when the licensee has executed it and in so doing has incurred expense," but that in such case it becomes an easement running with the land, a telegraph company, which with the consent of a railroad company built its lines upon the latter's right of way, and has maintained, renewed, and operated the same for 40 or 50 years, acquired a perpetual easement.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 7; Dec. Dig. ⬥⟲11.]

2. EASEMENTS ⬥⟲9—TELEGRAPH LINES—PRESCRIPTION.

The provision of Civ. Code Ga. 1910, § 4164, that "permissive possession cannot be the foundation of a prescription until an adverse claim and actual notice to the other party," does not mean that possession may not originate in permission, especially as applied to ways and like cases, where the possession is necessarily adverse from the beginning; and a telegraph company, which built its lines over the right of way of railroad companies under parol licenses, followed by their maintenance and operation for from 20 to 50 years under claim of right, acquired a prescriptive right to such maintenance.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 25, 27–33; Dec. Dig. ⬥⟲9.]

⬥⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3.** DEDICATION ⬤►4—ACTS CONSTITUTING—PUBLIC CHARACTER OF USE.

There can be no dedication of an easement, strictly speaking, except to the public generally; and a telegraph company, building its line on the right of way of a railroad company under a parol license, cannot claim an easement on the ground of dedication.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. § 1; Dec. Dig. ⬤►4.]

**4.** TELEGRAPHS AND TELEPHONES ⬤►11—CONTRACT BETWEEN TELEGRAPH AND RAILROAD COMPANY—CONSTRUCTION.

Complainant telegraph company and its predecessors in interest had constructed and maintained telegraph lines over the right of way of defendant railroad company and its predecessors under parol licenses for periods of from 20 to 40 years, when in 1896 a new contract was made between the parties. At that time, by reason of the nature and purpose of its structures and its long occupation, complainant had acquired a perpetual easement to maintain such lines. The contract provided in detail for reciprocal services to be performed by the parties, that it should supersede all prior contracts, and continue in force for a term of 10 years, after which it should be terminable on one year's notice. *Held* that, in view of the situation of the parties, the contract must be construed as intended only to govern the relations between the parties in the operation of complainant's lines, and not as affecting in any way the duration of complainant's easement to maintain such lines.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 7; Dec. Dig. ⬤►11.]

**5.** TELEGRAPHS AND TELEPHONES ⬤►11—RIGHT OF WAY—RIGHT OF RAILROAD COMPANY TO REMOVE LINES.

Where a telegraph company has for many years maintained and operated its lines over the right of way of a railroad company, as a part of a vast national system, under a right which it thought sufficient to entitle it to remain there, its lines are so affected by a public use that in case its claim proves to be unfounded, and the laws of the state give it the right to condemn right of way therefor, a federal court has power to enjoin their removal by the railroad company, and to fix the amount of compensation it must pay for its right of way, although it might not have jurisdiction of condemnation proceedings in invitum under the state statute, if the company were not already in possession.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 7; Dec. Dig. ⬤►11.]

**6.** EASEMENTS ⬤►1—NATURE AND INCIDENTS.

An "easement," such as for construction and maintenance of a telegraph line on a railroad right of way, as distinguished from a pure or technical easement, is an interest in land, which confers upon its owner some right, benefit, dominion, or lawful use out of or over the estate of another, and is a species of incorporeal hereditament.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 1, 2, 5–7; Dec. Dig. ⬤►1.

For other definitions, see Words and Phrases, First and Second Series, Easement.]

**7.** DEDICATION ⬤►1—NATURE AND REQUISITES.

"Dedication" is the giving of land, or an easement therein, for the use of the public, and applies only where the gift is for the use and benefit of the public generally.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 8, 10–12; Dec. Dig. ⬤►1.

For other definitions, see Words and Phrases, First and Second Series, Dedication.]

⬤►For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Western Union Telegraph Company against the Georgia Railroad & Banking Company, the Louisville & Nashville Railroad Company, and the Atlantic Coast Line Railroad Company. On motion by defendants to dismiss bill. Motion denied.

The Western Union Telegraph Company brought its bill against the Georgia Railroad & Banking Company, the Louisville & Nashville Railroad Company, and the Atlantic Coast Line Railroad Company, making the following allegations: Complainant is a citizen of the state of New York, the Georgia Railroad & Banking Company (hereinafter called the railroad company) is a citizen of the state of Georgia, the Louisville & Nashville Railroad Company is a citizen of Kentucky, and the Atlantic Coast Line Railroad Company is a citizen of the state of Virginia. The suit is of a civil nature in equity, in which the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000, and is between citizens of different states, and arises under the Constitution or laws of the United States, and is a suit to enforce a legal or equitable claim upon, and to remove a cloud on the title of, property within the Southern and Northern districts of Georgia. Complainant was incorporated in the state of New York in the year 1851 for the purpose of erecting, maintaining, and operating telegraph lines throughout the states and territories of the United States and other countries, and was authorized to purchase, lease, and acquire such property, rights, franchises, and privileges as might be necessary, including those belonging to any other telegraph company. On July 24, 1866, Congress passed what is known as the "Post Roads Act," providing that any telegraph company then or thereafter organized under the laws of any state of the United States should have the right to construct and operate telegraph lines over any of the post roads, etc., of the United States, upon filing its written acceptance of the provisions of said act with the Postmaster General, which was done by the telegraph company on June 8, 1867. Congress in 1838, and again in 1872, passed acts making each and every railroad within the limits of the United States then or thereafter completed a post route or post road. The General Assembly of the state of Georgia has granted to all telegraph companies (including complainant) the right to construct and maintain their lines along the rights of way of the several railroads of the state, and has conferred upon the telegraph companies the power of eminent domain and the right to condemn easements over the rights of way and property of the railroad companies of the state as well as over other property in the state.

The verified petition further alleges the construction, maintenance, and operation of telegraph lines upon the right of way of the Georgia Railroad & Banking Company from a period antedating the War between the States, continuously up to the present time, at great cost and expense to complainant and its predecessors; that these telegraph lines were intended to become and did become permanent and important parts, unlimited in duration and existence, of the systems of telegraph belonging to the various telegraph companies constructing and operating the same; that neither the railroad companies nor any other person at any time objected to the construction, maintenance, and operation of these telegraph lines, but that same was well known to the defendants, and to the public generally, and that they assented to the same; that different telegraph companies (naming them) in succession owned and operated these telegraph lines, until they were duly conveyed, together with all their appurtenances and easements, to the Western Union Telegraph Company, the complainant, a portion of said lines having been so conveyed to complainant on April 5, 1867, and the remainder on July 10, 1876; that the Southern Express Company was incorporated under the laws of Georgia in 1861, and was authorized to do a telegraph business, and that on October 1, 1865, a written contract was made between the Georgia Railroad & Banking Company and the Southern Express Company, whereby the former gave to the latter an irrevocable, assignable, and perpetual easement for the construction, reconstruction, maintenance, and operation of its telegraph lines upon and along the right of way of the railroad company, including all its branches. On October 19, 1872, the Macon & Augusta Rail-

road Company made a similar contract with the Southern & Atlantic Telegraph Company, of New York, giving to it a perpetual, assignable, and irrevocable easement for the maintenance, construction, and operation of its telegraph lines upon and along the right of way of the Macon & Augusta Railroad Company, which afterwards sold its railroad line (the Macon Branch) to the Georgia Railroad & Banking Company. Subsequently, on April 5, 1867, the Southern Express Company sold and conveyed its telegraph lines, easements, etc., to complainant, and on July 10, 1876, said Southern & Atlantic Telegraph Company sold and conveyed its telegraph lines to complainant, and thereupon complainant came into possession of all the telegraph lines, stations, etc., in controversy in this case, and became possessed of a perpetual, assignable, and irrevocable easement for the construction, maintenance, and operation of said lines of telegraph along the lines of the railroad company.

Complainant and its predecessors in title have from the very beginning, to wit, from a period antedating the Civil War, been in the quiet, peaceable, open, continuous, notorious, and exclusive possession of said lines of telegraph, and of the portion of the right of way of the railroad company occupied by same, with necessary easements and appurtenances belonging to same, and during all of said time they, at great cost and expense, constructed, reconstructed, maintained, and operated said telegraph lines as a component, important, and permanent part of their systems of telegraph which extended all over the United States; that in 1881 the Georgia Railroad & Banking Company leased all of the railroad lines owned by it to W. M. Wadley for 99 years, and subsequently this lease was acquired by the other defendants to this case, namely, the Louisville & Nashville Railroad Company and the Atlantic Coast Line Railroad Company; that for more than 20 years, to wit, for 40 years or more, complainant has been in the open, exclusive, etc., possession of said telegraph lines and easements, and that same are a component part of its vast telegraph system, consisting of more than 192,000 miles of poles and cables and over 900,000 miles of wires. covering practically the entire territory of the United States, and extending also to foreign countries; that these telegraph lines are necessary and indispensable links in its vast telegraph system, without which it would not be able to perform its duties to the public or to the United States government.

On the 8th day of July, 1896, the Georgia Railroad & Banking Company and the Western Union Telegraph Company entered into a "working contract" for the exchange of reciprocal services, said contract to continue for 10 years and thereafter for one year after express notice of a desire from either party to terminate same; this contract being made subsequent to the above-mentioned lease made by the Georgia. Railroad & Banking Company to the Atlantic Coast Line Railroad Company and the Louisville & Nashville Railroad Company. On August 10, 1912, said lessees notified complainant to remove its poles and wires from off the right of way of the Georgia Railroad & Banking Company, and that if complainant failed to do so within a year they stated that they would seize and take possession of the telegraph lines and property of complainant occupying the right of way aforesaid and dispose of same as they saw fit. Complainant thereupon brought this bill in equity, praying for an injunction to prevent the defendants from interfering with its telegraph lines, for a decree determining that complainant has a perpetual easement over the right of way of the railroad company, to remove a cloud from its title and to establish its rights to same, to prevent immeasurable and irreparable loss and damage, and to avoid a multiplicity of suits and large damages and penalties that would be entailed upon complainant for failure to promptly transmit telegraph messages as required by its duty to the public. Complainant also prayed in the alternative that, if it did not have a perpetual and irrevocable easement as claimed, inasmuch as it had already taken and occupied said right of way, it should be allowed to remain thereon, and that a decree should be entered for the amount it should pay the railroad company for such easement; and complainant also prayed for general and complete relief.

Defendants duly filed their motion to dismiss said bill upon several grounds, to wit: (1) That the Post Roads Act invoked by complainant gave

it no right to the easement in question without the consent of the railroad company, or without condemning same, and that the bill did not aver satisfaction of either of these conditions; (2) that the act of the General Assembly of Georgia conferring on telegraph companies the right to condemn an easement on the right of way of railroads was unconstitutional and null and void as interfering with interstate commerce, and that the Post Roads Act had withdrawn from the states the jurisdiction of such matters, and that complainant did not aver that it had exercised or was attempting to exercise the right of condemnation; (3) the bill was defective, in that it did not set out copies of the contracts under which it was alleged that the predecessors of complainant had occupied the right of way of the railroad company between the years 1850 and 1861; (4) the bill failed to allege adverse possession, but, on the contrary, showed that complainant's possession has all the time been permissive; (5) the bill shows no title to the easement in question in complainant, and the case is not one coming within the exercise of the court's jurisdiction to remove a cloud from a title; (6) the bill fails to show ground for jurisdiction to prevent a multiplicity of suits; (7) complainant pleads no facts which give the court jurisdiction to decree in invitum against defendants a title to the easement in question and to fix the compensation to be paid therefor by complainant to defendants, and also that complainant has an adequate remedy at law; and (8) the bill is multifarious and duplicitous.

Dorsey, Brewster, Howell & Heyman, of Atlanta, Ga., Wm. H. Barrett, of Augusta, Ga., and W. L. Clay, of Savannah, Ga., for complainant.

Jos. B. Cumming, Bryan Cumming, and J. M. Hull, Jr., all of Augusta, Ga., for defendants.

LAMBDIN, District Judge (after stating the facts as above). This case is now before me on motion filed by the defendants to dismiss the bill of complainant upon the grounds above stated.

[1] 1. The first question to be determined is whether, under the allegations of the bill, the telegraph company obtained a perpetual and irrevocable easement in and upon the right of way of the railroad company for the construction, maintenance, and operation of its telegraph lines. The telegraph company alleges that it and its predecessors derived title to such an easement in several different ways, as stated above, to wit: (a) By an executed parol license; (b) by express grant; (c) by prescription; and (d) by express or implied dedication to public use. If the allegations of the bill are sufficient to show by reasonable intendment and construction that the telegraph company acquired title to the easement in question in either of the four ways above mentioned, its title would be sufficient to withstand the attack made on it.

[6] (a) An easement of the kind involved in this case, as distinguished from a pure or technical easement, is an interest in land which confers a right upon its owner to some profit, benefit, dominion, or lawful use out of or over the estate of another. 10 Am. & Eng. Enc. (2d Ed.) 399; Huyck v. Andrews, 113 N. Y. 81, 20 N. E. 581, 3 L. R. A. 789, 10 Am. St. Rep. 432. Such an easement is a species of incorporeal hereditament, and, according to general law, can be acquired by grant, express or implied, or by prescription. 10 Am. & Eng. Enc. (2d Ed.) 409.

Under the laws of Georgia, however, this easement can be acquired in a third way, namely, by a parol license which has been executed and upon the faith of which the licensee has incurred expense. This

method of acquiring an easement is set out in the Code of Georgia of 1910 (section 3645), which is as follows:

"Sec. 3645. A parol license is primarily revocable at any time, if its revocation does no harm to the person to whom it has been granted, but is not revocable when the licensee has executed it and in so doing has incurred expense. In such case it becomes an easement running with the land."

This principle of the Georgia law has been applied as respects similar easements in the following cases: Sheffield v. Collier, 3 Ga. 82; Brantley v. Perry, 120 Ga. 760, 48 S. E. 332; Cherokee Mills v. Standard Cotton Mills, 138 Ga. 856, 76 S. E. 373; Whelchel v. Gainesville, etc., R. R. Co., 116 Ga. 431 (5), 42 S. E. 776; Southwestern Railroad v. Mitchell, 69 Ga. 114.

Complainant alleges that its predecessors in title went upon the railroad right of way involved in this case more than 40 or 50 years ago, and at great cost and expense constructed, maintained, and operated the telegraph lines, offices, and stations in question, and reconstructed, maintained, and operated same at great expense continuously as a component and necessary link of their systems of telegraph, and that all this was done with the full knowledge, permission, and assent of the railroad companies. Under the Georgia statute, which I think is controlling in the matter, I am of the opinion that the allegations of the bill on this question are sufficient to make out the acquisition and ownership on the part of the telegraph company of an easement over the railroad right of way in question.

The courts have uniformly held that in the very nature of things the construction of telegraph lines and similar works necessarily implies permanency and perpetuity of use, and that, where same are constructed under a license or agreement in which the period of the grant is not limited, a perpetual easement is necessarily granted. McKell v. C. & O. R. R. Co., 175 Fed. 321–330–332, 99 C. C. A. 109, 20 Ann. Cas. 1097; United States v. B. & O. R. R. Co., 1 Hughes, 145, Fed. Cas. No. 14510; Louisville v. Cumberland Telephone Co., 224 U. S. 663, 32 Sup. Ct. 572, 56 L. Ed. 934; City of Owensboro v. Cumberland Tel. & Tel. Co., 230 U. S. 58, 65, 33 Sup. Ct. 988, 57 L. Ed. 1389; Western Union Tel. Co. v. Penn. Co., 129 Fed. 849, 64 C. C. A. 285, 68 L. R. A. 968; Ashland Electric Power & Light Co. v. City of Ashland (D. C.) 217 Fed. 158.

In the City of Owensboro Case, cited above, Mr. Justice Lurton stated as follows:

"That the grant in the present case was not a mere license is evident from the fact that it was upon its face neither personal nor for a temporary purpose. * * * The grant by ordinance to an incorporated telephone company, its successors and assigns, of the right to occupy the streets and alleys of a city with its poles and wires for the necessary conduct of a telephone business, is a grant of a property right in perpetuity, unless limited in duration by the grant itself, or as a consequence of some limitation imposed by the general law of the state [citing several cases]. If there be authority to make the grant, and it contains no limitation or qualification as to duration, the plainest principles of justice and right demand that it shall not be cut down, in the absence of some controlling principle of public policy. This conclusion finds support from a consideration of the public and permanent character of the business such companies conduct and the large investment which is generally contemplated. If the grant be accepted and the contem-

plated expenditure made, the right cannot be destroyed by legislative enactment or city ordinance based upon legislative power, without violating the prohibitions placed in the Constitution for the protection of property rights."

Some of the authorities cited above deal with contracts, instead of with parol licenses, and hold that in the nature of things a contract granting an easement or right of way to telegraph companies and similar enterprises necessarily implies an irrevocable grant in perpetuity, and upon authority and reason the same principle is applicable where possession is taken under a parol license for similar works of a permanent nature. The Supreme Court of California, in the case of Stoner v. Zucker, 148 Cal. 516, 83 Pac. 808, 113 Am. St. Rep. 301, 7 Ann. Cas. 704, lays down the same principle in the following language, applying the same in the case of an irrigating ditch:

"Where one enters upon the land of another under a parol license, and expends money or labor in the execution of the license, it becomes irrevocable for so long a time as the nature of it calls for its continuance."

In said case the court held that the ditch in question was from its very nature a permanent structure, and that therefore the license was to be construed to be a continuous and perpetual easement, irrevocable in its nature, and that in every such case the licensor would be held to have conveyed an easement commensurate in its extent and duration with the right to be enjoyed and with the nature of the thing for which the license was given. Judge Lurton, speaking for the Circuit Court of Appeals of the Sixth Circuit, in the case of City of Morristown v. Telephone Co., 115 Fed. 304, on page 307, 53 C. C. A. 132, on page 135, said:

"Consent to the occupancy of the streets by the poles and wires of the telephone company for the purpose of maintaining a public telephone system was, the grant of an easement in the streets and the conveyance of an estate or property interest, which, being in a large sense the exercise of a proprietary or contractual right rather than legislative, was irrevocable after acceptance, unless the power to alter or revoke was reserved. This principle has too many times been declared and applied by this court to require further elaboration [citing many authorities]."

There is a conflict among the courts of the different states of the Union in reference to the question whether a parol license, which has been executed by the licensee and upon the faith of which he has expended money, is revocable or not; some courts holding that such an executed license is revocable, while others hold that it is irrevocable. This question, however, is not an open one in Georgia, because under section 3645 of the Code of Georgia, quoted above, it is expressly provided that a parol license is not revocable when the licensee has executed it, and in doing so has incurred expense, and that in such case it becomes an easement running with the land.

(b) Complainant also alleges that it acquired title to the easement in question by express written grant. These grants are those of October 1, 1865, from the Georgia Railroad & Banking Company to the Southern Express Company (from which the telegraph company derived title), and from the Macon & Augusta Railroad Company (which conveyed title to a portion of the lines in question to the Georgia Rail-

road & Banking Company) to the Southern & Atlantic Telegraph Company (the predecessor of the Western Union Telegraph Company), dated October 19, 1872. A reading of these two contracts discloses beyond question that the predecessors of the Western Union Telegraph Company were granted perpetual easements in and upon the rights of way of the said railroads for the construction, maintenance, and operation of telegraph lines on same, and that such grants became irrevocable and assignable upon the construction of said telegraph lines as long as same should be kept in operation. The bill also alleges that said express company and said Southern & Atlantic Telegraph Company in due course respectively conveyed their telegraph lines, easements, and appurtenances to the Western Union Telegraph Company, which is now the owner and holder of same. The court is of the opinion that title to the easement in question by grant is therefore sufficiently alleged.

[2] (c) The telegraph company also claims title to said easement by prescription. Section 4170 of the Code of Georgia of 1910 is in the following language:

"An incorporeal right which may be lawfully granted, as a right of way or the right to throw water upon the land of another, may be acquired by prescription."

See, also, Phinizy v. Augusta, 47 Ga. 260; 22 Am. & Eng. Enc. of Law, 1182, 1187.

The bill alleges that complainant and its predecessors in title have been in possession of the easement in question for from 20 to 50 years, and that such possession has been public, continuous, open, notorious, exclusive, uninterrupted, and peaceable, and accompanied by a claim of right. These allegations satisfy the statutes and the decisions of the highest court of this state, on the subject. See Code of Georgia of 1910, §§ 3641, 3810, 4163, 4164.

The principal argument of counsel for defendants on this point is that the possession of the complainant and its predecessors was permissive, and not adverse, and they rely upon the concluding sentence of section 4164 of the Georgia Code, which is in the following language:

Permissive possession cannot be the foundation of a prescription, until an adverse claim and actual notice to the other party."

This expression of the law, however, does not mean that the possession must not originate in permission. If, for instance, a grantor executes a deed to his grantee, and in pursuance thereof permits him to take possession of the property granted, or if a licensor gives a parol license to a licensee for a right of way over his premises (upon the faith of which the licensee makes an outlay of money in improvements necessarily permanent in their nature), then in both of these instances the possession originates in permission, but it thereupon becomes adverse, and does not continue to be permissive. Mr. Justice Lamar, in the case of Kirkland v. Pitman, 122 Ga. 256, on page 259, 50 S. E. 117, on page 118, said:

"Possession must be adverse in order to form the basis for prescription. A notable exception exists, however, in the case of private ways. The use may originate in permission, and yet may ripen by prescription."

The Supreme Court of Georgia, in the case of Everedge et al. v. Alexander, 75 Ga. 858, in the fourth headnote, lays down the principle in the following language:

"The doctrine that prescriptive titles to the fee in real estate by seven years' possession cannot originate in consent, because the possession there must be adverse all the time, does not prevail or apply to a right of way under the act of 1872 and the Code, for the reason that knowledge and acquiescence of the owner of the lands is of the very essence of the right of way against the owner."

Of course, there is a distinction between what is known as a private way (which was involved in the cases cited) and the easement claimed by the telegraph company in this case; but the rights involved in said matters are very similar in their nature, and the court is of the opinion that the decisions of the Supreme Court of Georgia cited above are applicable to the question here involved.

The Supreme Court of Washington, in the case of Lechman v. Mills, 46 Wash. 624, 91 Pac. 11, 13 L. R. A. (N. S.) 990, 13 Ann. Cas. 923, said:

"A parol grant of an easement which is void under the statute of frauds may become the basis for an adverse possession which will ripen into title by the lapse of time."

As stated, also, in the case of Coventon v. Seufert, 23 Or. 548, 32 Pac. 508:

"It is no objection to granting an easement by prescription that the same was originally granted * * * by parol. That the use began by permission does not affect the prescriptive right, if it has been used and exercised for the requisite period under a claim of right."

The Supreme Court of New Hampshire, in the case of Wells v. Parker, 74 N. H. 193, 66 Atl. 121, said:

"While no estate passed for want of a deed, the parties may have treated the transaction as having that effect; and if they did, the donee's subsequent uninterrupted possession might reasonably be deemed to exist under a claim of ownership, with the knowledge and acquiescence of the donor. The legal effect of the transaction did not preclude the parties from claiming that it had a different effect, which, if persisted in for sufficient length of time and attended with uninterrupted possession, would give the donee * * * the equivalent to a title by deed."

In Gyra v. Windler, 40 Colo. 366, 91 Pac. 36, 13 Ann. Cas. 841, it was held that where a donee of a right of way across the property of another, which was granted by parol had uninterruptedly used same for more than the statutory period, with the knowledge and acquiescence of the donor and his grantees, his right to the use thereof could not be terminated by them.

Counsel for defendants insist in their motion that the allegations of the bill as to a prescriptive title are fatally defective, for the reason that complainant nowhere alleges that its possession was "adverse." The Supreme Court of Georgia in the case of Moody v. Fleming, 4 Ga. 116 (5), 48 Am. Dec. 210, has defined "adverse possession" to be possession

under color and claim of title. We think that, while complainant has not used the word "adverse" in the allegations of its bill, still it has used expressions which are tantamount thereto, and that therefore the allegations of the bill are sufficient to show title by prescription.

[3, 7] (d) Complainant also alleges in its bill that there has been a dedication, express or implied, of the easement in question to public use. Dedication is the giving of land or an easement therein for the use of the public, and same applies only where the gift is for the use and benefit of the public generally. "There can be no dedication, strictly speaking, to private uses, nor even to uses public in their nature, but the enjoyment of which is restricted to a limited part of the public." Thus a railroad company cannot claim lands by dedication. 9 Am. & Eng. Enc. of Law (2d Ed.) 23; Lake Erie, etc., R. R. Co. v. Whitham, 155 Ill. 514, 40 N. E. 1014, 28 L. R. A. 612, 46 Am. St. Rep. 355. On principle, therefore, complainant cannot claim title to the easement in question by dedication. While this is true, telegraph companies are public service corporations and common carriers, and also instruments of commerce, both state and interstate Pensacola Tel. Co. v. W. U. Tel. Co., 96 U. S. 1, 24 L. Ed. 708; W. U. Tel. Co. v. Texas, 105 U. S. 464, 26 L. Ed. 1067; Ratterman v. W. U. Tel. Co., 127 U. S. 425, 8 Sup. Ct. 1127, 32 L. Ed. 229.

Telegraph companies are given great rights and powers, both by national laws and also by the statutes of Georgia; but these laws and statutes also impose certain public duties and obligations upon the telegraph companies. The property of the telegraph company, including the easement or rights of way possessed by them, are therefore affected with a public use. This principle is important in this case only as causing the courts to be reluctant to deprive such quasi public corporations of these rights of way, which may have been already taken and occupied by them, in the event they are not legally entitled to same, when proper compensation may be decreed by the court to be paid for same. But this matter will be treated in a further division of this opinion.

[4] 2. The principal contention in this case, however, is as to the force and effect of the contract made between the Western Union Telegraph Company and the Georgia Railroad & Banking Company on the 8th day of July, 1896. It is contended on the part of the railroad company that this contract, in the first place, showed that the occupation by the telegraph company of the right of way of the railroad company was only permissive, and that, in the second place, said contract limited the easement of the telegraph company in said right of way to a term of 10 years from July 1, 1896, or until after the expiration of one year after written notice by the railroad company of an intention to terminate the same. The telegraph company, on the other hand, contends that this last-named contract was merely a reassurance and confirmation of the easement already owned by it, and that the contract did not attempt to limit the duration of this easement, but was merely intended to provide for reciprocal services to be performed by the two contracting parties.

The construction of this contract is therefore the pivotal question in the case. Was it intended by the parties that by this contract the rights

of the telegraph company to the easement in question should terminate at the expiration of the period mentioned? In order to determine this question, it is necessary to consider the situation and rights of the parties at the time the contract was made, the purposes of their incorporation and their business, and the objects sought by the contract. All the surrounding facts and circumstances should be carefully considered, so as to arrive at the true intent of the parties. It is recited in the beginning of the contract, or preamble, that:

"Whereas, the railroad company owns and controls and operates certain railroad lines [describing them], and the telegraph company owns lines of telegraph poles and wires which are operated under the provisions of the agreements hereinafter mentioned; and whereas, it is desirable in the interest of both parties hereto that a new agreement shall be entered into between them."

In this preamble, the ownership of the railroad lines by the one party and of the telegraph lines by the other party is admitted, and it is also stated that the telegraph lines are operated by the telegraph company under the provisions of certain agreements, and that it is desirable that a new agreement should be entered into between the parties. The object or purpose of the contract is therefore set out in this preamble. This object is there stated to be the execution of a new agreement. A new agreement for what? The preamble expressly states that it was a new agreement to take the place of certain old agreements "under which the telegraph lines were operated." It is therefore clearly stated in this preamble that the new agreement was intended to cover the operations by the telegraph company of its lines.

At the time this last contract was made, it is clear, from the considerations set forth in the first part of this opinion, that the telegraph company had a perpetual irrevocable easement in and upon the right of way of the railroad company. The telegraph company was incorporated for maintaining telegraph lines and transmitting messages over same, its business in this line was an extensive one, and its telegraph lines, stations, etc., along the right of way of the railroad company were an important link in its vast network of wires and in its business, which reached to all parts of the United States and to foreign countries. Such being the situation of the parties at the time, is it probable that the telegraph company intended, after the expiration of the period mentioned in said last-mentioned contract, to cut out its business along the line of the railroad company and to remove its property therefrom, and thus close out a business that had been in process of development for more than a half a century? To ask this question is to answer it. It is inconceivable to the mind of the court that the telegraph company could have agreed to have exchanged the perpetual easement held by it for a mere 10-year lease, with the prospect of having to remove its lines and abandon its business along the line of the railroad company at the expiration of that time.

It is contended in behalf of the defendants that this contract contains in the sixth paragraph a recognition on the part of the telegraph company that it did not have a perpetual easement in the right of way in question, because it accepted such an easement under and by virtue of said paragraph, which is in the following language:

"The railroad company, so far as it legally may, hereby grants and agrees to assure to the telegraph company the exclusive right of way (except as hereinafter mentioned), on, along, and under the line, lands, and bridges, and on both sides of the tracks of the railroads now or hereafter covered by this agreement, and any extensions and branches thereof, for the construction, maintenance, operation, and use of lines of poles and wires," etc.

The language here used, in the opinion of the court, is not inconsistent with the idea that the telegraph company already had a right of way along the lines of the railroad company then existing, and that the purpose of same was to give a reassurance and confirmation of this easement, and also to grant a right of way along the tracks of the railroad company and any extensions and branches thereof, along which the telegraph company had not then constructed its lines, and also to give it the right to occupy both sides of the track where it already occupied one side, and, lastly, to make these grants and privileges exclusive. The language used is no recognition that the telegraph company did not already have title. Even if the language used could be construed as granting to the telegraph company the right of way or easement already held by it, it is well settled that the acceptance of such a grant by the telegraph company would not estop it from setting up and maintaining that it already had title to this easement and did not acquire same by such grant.

Even if the telegraph company had never occupied the right of way of the railroad company before making this contract of 1896, but had gone upon same under said contract, it is clear to the mind of the court that even in such a case the easement acquired by the telegraph company under the grant would not have terminated at the end of the period of 10 years mentioned in the contract. The contract, even if it had been the first and only contract between the parties, and the one under which the telegraph company first took possession of its easement as above supposed, may be analyzed as consisting of two parts— one granting to the telegraph company the right to go on the railroad right of way and construct its lines, and the other providing for the operation of these lines and an exchange of reciprocal services between the parties. When the telegraph company constructed its lines on the right of way of the railroad company, the first part of the contract became executed, while the other provisions of the contract were continuous and executory in their nature. When the first part of the contract was thus executed, the telegraph company became vested with title to the easement in question, which under the authorities cited in the first part of this opinion became permanent and irrevocable; and while the contract for the continuing and reciprocal services could be terminated, the title so acquired by the telegraph company to the easement in question could not be divested, because there was no defeasance or forfeiture clause in the contract.

Much reliance is placed by defendants upon the twelfth paragraph of the contract of 1896, which provides that said contract should supersede the contract of 1865 between the Georgia Railroad & Banking Company and the Southern Express Company, and a contract made in 1880 between the telegraph company and the railroad company in respect to a money limit of free telegraphic and transportation serv-

ice, and the contract of 1872 between the Southern & Atlantic Telegraph Company and the Macon & Augusta Railroad Company, as well as any other agreements between the parties or their predecessors. We think that it is clear that only the provisions of these contracts relative to the operations of the telegraph lines and the reciprocal services to be performed by the parties were "superseded" under the terms of this paragraph of the contract. Title had already vested in the telegraph company, and it already owned the easement in question, and the word "supersede" cannot, in our opinion, be made to effect a conveyance or relinquishment of title. The word "supersede" only operated upon the agreements in the contracts in question relative to the services to be performed by the parties, and to the executory or working" agreements contained in the contract, and was not intended to operate on the title to the property, or to reconvey same to the railroad company at the expiration of the time in question.

The thirteenth paragraph of the contract provides that:

"The provisions of this agreement shall be and continue in force for and during the term of 10 years from the 1st day of July, 1896, and shall continue after the close of said term until the expiration of one year after written notice shall have been given after the close of said term by either party to the other," etc.

From the foregoing reasoning, we are clear that the purpose of this clause was not to terminate the easement of the telegraph company, or to effect a relinquishment or reconveyance of the title held by it, but merely to terminate the provisions of the contract providing for reciprocal services to be performed by the parties thereto.

As further illustrative of the nature of the contract of 1896, it may be well to recall the fact that the contract that had previously been in existence between the two parties had been made from 24 to 30 years before that date, and they were in the main made between the predecessors of the parties in interest, and not between the parties themselves. These contracts were old and meager in terms, and were made when the operations of neither of the parties were as extensive and complicated as they were in 1896. Such being the case, it is quite clear that it was the intention of the parties to rearrange these contracts and to bring them up to date. The new contract went into great detail and was quite exhaustive as to the services to be performed by each of the parties thereto, and it is clear to the mind of the court that the real purpose of the contract was to cover these services, and not to provide for the duration of the easement of the telegraph company. Such a drastic, sweeping, and extraordinary thing as the destruction and abandonment of this easement, if it had been intended, would not have been left to construction, but would have been expressly set out, and nowhere in the contract is it provided that at the expiration of the short period in question the telegraph company should abandon its easement, and give same up forever, and remove its lines from the right of way of the railroad company.

Circuit Judge Van Devanter, in the case of Choctaw, etc., Railroad v. Bond, speaking for the Circuit Court of Appeals of the Eighth Circuit, in 160 Fed. 403, 87 C. C. A. 355, said:

"A contract should not be construed as providing for an unreasonable and oppressive forfeiture, if its language fairly admits of a more equitable interpretation."

In this case he cited Washington, etc., Co. v. Cœur d'Alene, etc., Co., 160 U. S. 77, 101, 16 Sup. Ct. 231, 40 L. Ed. 355. As stated by the Supreme Court of the United States in the case of Joy v. St. Louis, 138 U. S. 2, 38, 11 Sup. Ct. 253, 34 L. Ed. 843, railroad contracts respecting easements, a matter concerning the interest of the public, "are to be construed liberally in favor of the public."

Circuit Judge Gray, for the United States Circuit Court of Appeals of the Third Circuit, in the case of Western Union Telegraph Co. v. Penn. Co., 129 Fed. 849, 64 C. C. A. 285, 68 L. R. A. 968, in construing a similar contract to the one here involved, at the bottom of page 867 of 129 Fed., page 303 of 64 C. C. A., said:

"On the whole, we are of opinion that the relations created between the parties by the agreement in question were not merely personal, as in cases of partnership, agency, master and servant, and the like, but that rights in property and the user thereof, rights in the nature of an easement, were conferred upon the appellant, and that no right in the appellee to revoke or determine the same, in the absence of express stipulation to that effect, is to be inferred from the silence of the contract in that respect, or from its terms, purpose, or inherent nature."

This case is referred to approvingly in the case of McKell v. Chesapeake & O. Ry. Co. (Circuit Court of Appeals, Sixth Circuit) 175 Fed. 321, and near the bottom of page 322, 99 C. C. A. 109, 20 Ann. Cas. 1097.

In the case of St. Paul, M. & M. Ry. Co. v. W. U. Tel. Co. et al. (Circuit Court of Appeals, Eighth Circuit) 118 Fed. 497, 515, 55 C. C. A. 263, 281, the court had under consideration a very similar contract to the one involved here. In fact, the present contract seems to be a stock form of contract, used very generally. In this case, which is directly in point, the court said:

"In view of the considerations aforesaid, it is likewise manifest, we think, that the Western Union Telegraph Company did not enter into contract B with the understanding that the clause found in the twelfth paragraph, declaring that it should 'continue in force for the term of 10 years,' would have the effect of transferring to the railway company, at the end of the contract period, all the lines—those already existing, of which it was then a joint owner, as well as those which it might subsequently erect at its sole cost and expense. That view of the effect of the contract, involving, as it did, the relinquishment on its part of its interest in the lines jointly owned, and in other lines of telegraph, erected at its own expense, which might be 2,000 or 3,000 miles in length, and involving, as well, the disruption pro tanto of its telegraphic system, renders it altogether too unreasonable, not to say unconscionable and absurd, to warrant a court of justice in presuming for a moment that the telegraph company intended to enter into such an agreement, or supposed that it had done so. It is a general rule for the interpretation of contracts, as well as for the interpretation of statutes, that they should not be so construed as to lead to injustice, oppression, or absurd consequences, if such a result can be avoided. U. S. v. Kirby, 7 Wall. 482, 486, 19 L. Ed. 278; Lau Ow Bew v. U. S., 144 U. S. 47 [12 Sup. Ct. 517, 36 L. Ed. 340]; Holy Trinity Church v. U. S., 143 U. S. 457 [12 Sup. Ct. 511, 36 L. Ed. 226]. * * * Looking at the situation and relation of the parties at the time contract B was executed, we think that it is entirely reasonable to infer that the clause declaring that the contract should continue in force for

10 years has reference to the terms upon which lines of telegraph should be constructed, maintained, and operated during that period, and that it was not intended to have any effect upon the ownership of the lines. * * * They did not intend, however, by this clause, to extinguish the telegraph company's interest in the lines of telegraph at the end of the contract period."

The court referred in that case expressly to the fact that there was no express agreement in the contract that the telegraph lines should be removed at the expiration of the term in question. The case last cited and the case at bar differ, therefore, entirely from the case of W. U. Tel. Co. v. Penn. R. R. Co., 195 U. S. 540, 25 Sup. Ct. 133, 49 L. Ed. 312, 1 Ann. Cas. 517, because in that case it was expressly provided in the contract then under consideration that at the expiration of · the period named in the contract the telegraph company should remove its lines from the right of way of the railroad company. Consequently the court is of the opinion that the contract of 1896 did not have the effect contended for by the defendants.

[5] 3. The complainant in its bill prayed for alternative relief; that is, it prayed that, in the event the court should hold that it did not have an easement in the right of way of the railroad company, the court would grant it alternative relief by decreeing the amount of damages it should pay to the railroad company as compensation for the right of way occupied by it. Under the facts in this case, the court is of the opinion that, even if the telegraph company did not have a perpetual easement along the right of way of the railroad company, the court would have the right to enjoin the railroad company from removing the property of the telegraph company from its right of way and to assess the damages which the telegraph company should pay therefor. The statutes of Georgia give to complainant the power of eminent domain, and the right to condemn a right of way over the property and right of way of the railroad company, if it has not one already.

It is contended that this court has no jurisdiction over condemnation proceedings ab initio. The court is disposed to agree to this view; that is, it does not think that, if the telegraph company were not already on the right of way, this court would have a right to entertain such a proceeding in its initial steps. However, the case here is different. The telegraph company is a common carrier, and is recognized and encouraged by the laws of the state, as well as the Post Roads Act of Congress (Act July 24, 1866, c. 230, 14 Stat. 221 [Comp. St. 1913, §§ 10072–10077]) and the acts amendatory thereof. It is therefore affected with a public use. It is already on the right of way of the railroad company under a claim which it thought sufficient to allow it to remain there. It has already taken this easement, and is now in possession of same; and, such being the case, will this court allow the railroad company to eject the telegraph company from its right of way, and thus destroy its lines which are affected with a public use?

This question has been decided in principle adversely to the contentions of the defendants in the case of Atlanta, Knoxville & Northern Ry. Co. v. Barker, 105 Ga. 534–542, 31 S. E. 452, in which in a very elaborate opinion Mr. Justice Cobb held that a person could not recover

in ejectment a right of way occupied by a railroad over his land upon which the railroad had built its tracks and was operating its lines, although the plaintiff held title to the land; the decision being based upon the interest of the public involved in the continuous operation of the railroad. The same question is discussed and decided in the same way in the case of Charleston, etc., Ry. Co. v. Hughes, 105 Ga. 1, 16, 30 S. E. 972, 978, 70 Am. St. Rep. 17, where a railroad company entered upon certain property by agreement with the life tenant, and thereafter upon the death of the life tenant the remaindermen brought suit for the land. In this case the court said:

"Controversies in which a corporation charged with the duties incumbent upon carriers of passengers, freight, and mails, in which an effort is made by private individuals or others to take away from such corporation a part of the property in its possession, which is absolutely essential to its complete performance of the public duties required of it, become matters of more than private concern, and in which the public is deeply and seriously interested. For this reason it has become settled law that the harsh remedies which would be allowed to one individual against another in reference to the possession of land will not be allowed to one who is seeking to recover such property from a railroad company, when exact justice can be done to such owner by giving him remedies which are less severe in their nature, and by which he would secure substantially the same rights, thereby saving to the public the right to require a performance of the public duties incumbent upon the corporation whose property is the subject-matter of the controversy."

These decisions are quoted approvingly by the Supreme Court of the United States in several cases. The Court of Appeals of the Eighth Circuit reached the same conclusion in the case of St. Paul, etc., Co. v. W. U. Tel. Co., 118 Fed. 497, 519, 55 C. C. A. 263, cited above, in which it granted the alternative relief prayed for in this case. The Supreme Court of the United States, in the case of New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820, citing the two Georgia cases above in 105 Ga., granted the same alternative relief to the city of New York in a very exhaustive opinion on the subject. See, also, Roberts v. Northern Pacific R. R. Co., 158 U. S. 1–30, 15 Sup. Ct. 756, 39 L. Ed. 873; Northern Pacific R. R. Co. v. Smith, 171 U. S. 260, 18 Sup. Ct. 794, 43 L. Ed. 157; Donohue v. El Paso, etc., R. R. Co., 214 U. S. 499, 29 Sup. Ct. 698, 53 L. Ed. 1060.

Counsel for defendant rely greatly upon the case of the Western Union Telegraph Co. v. Ann Arbor R. R. Co., 90 Fed. 379, 33 C. C. A. 113, in which Mr. Justice Taft, speaking for the court, held that the United States court had no right to condemn an easement for the telegraph company, where the railroad had been sold out under a mortgage placed upon the railroad before the first railroad made the contract with the telegraph company. This remark of Judge Taft, standing alone at the end of the decision, would seem to be against the position here taken; but this case went up to the Supreme Court of the United States and is to be found in 178 U. S. 243, 20 Sup. Ct. 867, 44 L. Ed. 1052. In that case the Supreme Court states that the nature of the bill was for specific performance, and held that the bill was not framed to support the alternative relief prayed for. In the case now under consideration the bill is framed specifically asking for this alternative relief. We think that this court has the power to assess the amount of

money to be paid to the railroad company for the easement in question. This is clearly pointed out by Mr. Justice Harlan in his dissenting opinion in the case of W. U. Tel. Co. v. Penn. R. R. Co., 195 U. S. pages 575 to 593, 25 Sup. Ct. 133, 49 L. Ed. 312, 1 Ann. Cas. 517, and the cases there cited by him.

4. The court is of the opinion that the Post Roads Act, which is invoked by complainant, is only entitled to consideration as showing the policy of the United States government in reference to telegraph companies, and as showing that the property in question is an instrument of interstate commerce, and that therefore, in conformity with the Barker and Hughes Cases in 105 Ga., above cited, a court of equity should grant the alternative relief prayed for in the event the telegraph company did not actually possess a right to the easement in question.

5. We do not think that the bill could be maintained alone on the ground that it was brought to prevent a multiplicity of suits; but the other allegations of the bill are sufficient to enable it to withstand the motion of defendants. We do not think that complainant has an adequate remedy at law, because it cannot set up the title claimed by it to the easement in question in a strict condemnation or other proceeding at law. Nor do we think that the bill is multifarious or duplicitous, or subject to any of the other objections urged against it by defendants.

An order will be entered, therefore, in this case, overruling the motion of defendants, and allowing the case to proceed upon its merits.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes