WESTERN UNION TELEGRAPH COMPANY *v.* ROAD IMPROVEMENT DISTRICT No. 1 OF CLEVELAND COUNTY.

Opinion delivered June 14, 1920.

HIGHWAYS—ASSESSMENT OF TELEGRAPH COMPANY'S RIGHT-OF-WAY.—A contract between a telegraph and a railroad company granted an exclusive right to the telegraph company to maintain a telegraph system along the railway right-of-way, and permitted a termination of the contract on one year's notice after the expiration

of twenty-five years, but without requiring removal of the lines. The system was shown to be a permanent construction, and the telegraph company could acquire a permanent easement. *Held* that the property of the telegraph company is real property and subject to assessment for road district benefits, under Road Laws 1919, No. 612, § 5.

Appeal from Cleveland Chancery Court; *John M. Elliott,* Chancellor; affirmed.

*Bridges & Wooldridge* and *Harry T. Wooldridge,* for appellant.

Act 612 evidently proceeds under the theory that the property of a telegraph company is real estate and assessable for improvement taxes, but it is personal property and not taxable for local improvements. 129 Ark. 542; 119 *Id.* 254; 121 *Id.* 105. The telegraph company has only a lease for a term of years, revocable in the manner designated in the contract. The property of the telegraph company is personal property and not subject to local improvement taxes, and the act is invalid. Cases *supra;* 119 Ark. 254; 71 So. Rep. 118; 238 Fed. 26; 125 Fed. 67; 50 *Id.* 494; 118 *Id.* 497; 27 A. & E. Enc. L. 1011; 11 Fed. 1; 1 *Id.* 745; 238 Fed. 26. The Legislature in this act did not attempt to classify the property of the telegraph company as real property, but was laboring under the delusion that it was real property when it was personalty, and the chancellor erred in his decision.

*Rowell & Alexander* and *Coleman, Robinson & House,* for appellee.

If under the laws of this State the property is personal and not real, it can not be taxed for local improvements, but our contention is that it is real property and subject to assessment. It is an ''easement'' or interest in land. 73 Ark. 296; 112 *Id.* 572. It is more than an easement, it is real property. 227 Fed. 276. The company had a permanent interest in the land itself. *Ib.* 285; 175 Fed. 321; 20 Anno. Cases 1097; 7 Wall. 482; 144 U. S. 47; 143 *Id.* 457. Under the decisions of Arkansas the poles and wires are real estate and taxable. 26

Ark. 55; 73 *Id.* 427; 9 Baxter (Tenn.) 509; 80 N. Y. 408. The Legislature has classified it as real property and the legislative will is supreme. 102 Ill. 655; 88 Ill. 615; 1 Page & Jones on Taxation by Assessment 872; 27 A. & E. Enc. L. (2 ed.) 635-6; 81 Ark. 562. The Legislature has acted and has classified telegraph property as realty, and as such taxable. Cases *supra.*

Humphreys, J. Appellant instituted suit against appellee in the Cleveland Chancery Court to set aside the benefits assessed and fixed against its property by the board of commissioners of appellee district, on the ground that the property owned by it in said Road Improvement District No. 1 is personal, instead of real, property.

Appellee filed answer, denying that its property in said district, against which benefits were assessed, is personal property.

The cause was submitted upon the pleadings and an agreed statement of facts, to which a contract between appellant and the St. Louis Southwestern Railway Company was attached as "Exhibit A" and made a part of the evidence in the case, from which the court found that the property in question was real estate, and decreed that the petition of appellant be dismissed for want of equity. From the decree of dismissal an appeal has been duly prosecuted to this court.

The appellee, Road Improvement District No. 1 of Cleveland County, was organized under act 612 of the Legislature, approved April 1, 1919. The benefits to the property in question were assessed by the board of commissioners of said district under section 5 of said act, which is as follows:

"Said commissioners shall proceed to assess the lands within the district and shall inscribe in a book each tract of land and shall assess the value of the benefits to accrue to each tract by reason of such improvement, and shall enter such assessment of benefits opposite the description together with the estimate of the probable cost to the land owner. Their assessment shall

embrace not merely the lands, but all railroads, tram-roads, telegraph, telephone and pipe lines, and other improvements on real estate that will be benefited by the improving of the roads; and wherever the word 'lands' is used in this act, it shall be construed to embrace all property subject to taxation herein. The commissioners shall place opposite each tract the name of the supposed owner as shown by the last county assessment list. The commissioners shall also assess all damages that will accrue to any land owner by reason of the proposed improvement, including all injury to lands taken or damaged; and where they return no such damages as to any tract of land, it shall be deemed a finding by them that no damages will be sustained.''

The agreed statement of facts is as follows: ''That the above road district was created under act No. 612 of the General Assembly of the State of Arkansas, approved April 1, 1919, that the commissioners, as provided in said act have assessed the benefits against the lands within the district and have filed the same in the office of the clerk of the county court of Cleveland County.

''That there are five and one-half (5½) miles of telegraph line within the boundary of said district; that benefits to said telegraph line have been assessed by the assessors of said district at twenty-five dollars ($25) per mile for said five and one-half miles, aggregating benefits in the sum of one hundred, thirty-seven and 50/100 ($137.50) dollars:

''That the property of said telegraph company within said district consists of one hundred and sixty-five (165) white cedar poles, upon which are strung various wires, that these poles are guyed on curves with standard anchor rods and guy wire, that two cross-arms are attached to these poles with through bolts and arm braces to support the wire, that these wires are on standard steel pins and insulators, that the only office of the telegraph company in the district is at Rison, Arkansas, at which station the company has a standard switch-

board with three common sets of Morse instruments, etc. The wires enter the depot of the St. Louis Southwestern Railway Company through one hundred and twenty-five (125) feet of ten pair rubber-covered cables.

"That the five and one-half miles of the telegraph line of the complainant is located on the right-of-way of the St. Louis Southwestern Railway Company, the company furnishing all labor to maintain the wires, the telegraph company furnishing all material for maintenance. For furnishing the labor to maintain the telegraph lines the railway company gets free use and joint use of certain wires owned by the telegraph company.

"That the complainant, telegraph company, owns no real estate within said improvement district, unless the rights obtained under contract hereto attached constitute an easement which is taxable under the law as real estate.

"That the poles upon which the wires are strung are placed in the ground on the right-of-way of the St. Louis Southwestern Railway Company under a contract between the said telegraph company and the St. Louis Southwestern Railway Company. A copy of which is attached hereto, as "Exhibit A" and made a part of this statement of facts, which contract is now in force between said telegraph company and railway company, and has been since its execution.

"That under said contract said telegraph company has the privilege and right of placing its telegraph poles upon which its wires are strung along and upon the right-of-way of said railway company; that the poles and wires of said telegraph company are so placed and maintained upon the right-of-way of said St. Louis Southwestern Railway Company through the county of Cleveland, Arkansas.

"That the telegraph line and property of the complainant in Arkansas are assessed for the purpose of taxation by the Tax Commission in Arkansas; that the said Tax Commission has assessed the telegraph line and property of the complainant for the year 1919, and for

several years past, as personal property, and has not and does not assess any part of the line and property of complainant as real estate.

"That said Tax Commission certifies out from its office to various county clerks through which complainant's telegraph line may run its assessment of complainant's property as personal property, and that the assessment of complainant's property in Cleveland County is so certified to the county clerk of said county, which assessment includes the mileage of complainant's telegraph line within said improvement district.

"That said Tax Commission directs the assessors of the various counties to place the amount of the assessment of complainant's property on the personal property tax record, and that complainant pays taxes on its property and so certified upon same as personal property."

The contract attached as an exhibit and made a part of the evidence is of such great length that it is impractical to set it out in this opinion *in toto*. The three clauses of the contract relating more directly than any others to the question to be determined on this appeal are the preamble, a part of the ninth and all of the thirteenth clause, which are as follows:

PREAMBLE. "That whereas, the telegraph company owns lines of telegraph along the railway company's railroad from Birds Point, Mo., opposite Cairo, Ill., to Gatesville, Texas, and along the various branches thereof, which telegraph lines are now operated under the provisions of an agreement dated the second (2d) day of July, 1888, made by and between the telegraph company and the St. Louis, Arkansas & Texas Railway Company in Arkansas and Missouri, whose property has been sold under foreclosure of mortgages; and it is desirable in the interest of both parties hereto that a new agreement be entered into between them superseding and taking the place of said agreement hereinbefore mentioned, and extending to all railroads now owned, leased or controlled, and to all railroads hereafter owned,

leased or controlled by the railway company, party hereto, and extensions or branches thereof.''

### Part of Ninth Clause.

''The railway company, so far as it legally may, hereby grants and agrees to assure to the telegraph company the exclusive right-of-way on, along and under the line, lands, and bridges of the railway company, and any extensions and branches thereof, for the construction, maintenance, operation and use of lines of poles and wires and underground or other lines for commercial or public telegraph and telephone uses or business, with the right to put up or construct, or cause to be put up or constructed from time to time, such additional wires and such additional lines of poles and wires and underground or other lines as the telegraph company may deem expedient, and the railway company agrees to clear and keep clear said right-of-way of all trees, undergrowth and other obstructions to the construction and maintenance of the lines and wires provided for herein, and the railway company will not transport men or material for the construction, maintenance or operation of a line of poles and wire or wires or underground or other line in competition with the lines of the telegraph company party hereto, except at and for the railway company's regular local rates, nor will it furnish for any competing line any facilities or assistance that it may lawfully withhold, nor stop its trains, nor distribute material therefor at other than regular stations.''

### Thirteenth Clause.

''The provisions of this agreement shall supersede said agreement hereinbefore mentioned, and shall extend to all railroads now owned, leased, controlled or operated and to all railroads hereafter owned, leased, controlled or operated, by the railway company or by any company or corporation, in which the railway company may own a majority of the stock, or whose action it may be able to control by the ownership of stock or otherwise, and the provisions of this agreement shall be

and continue in force for and during the term of twenty-five years from the thirtieth day of July, 1901, and shall continue after the close of said term until the expiration of one year after written notice shall have been given after the close of said term by either party to the other of an intention to terminate the same, and in case of any disagreement concerning the true intent and meaning of any of said provisions, the subject of such difference shall be referred to three arbitrators, one to be chosen by each party hereto and the third by the two others chosen and the decision of such arbitrators or a majority thereof shall be final and conclusive.''

The other sections of the contract relate to the duties and requirements of each party in the construction and maintenance of the telegraph lines, the use of certain wires to transmit railway messages, the employment of, joint employees, management of joint offices and other reciprocal services necessary for the operation of the lines.

It is contended by appellant that the occupation of the right-of-way of the St. Louis Southwestern Company by appellant was only permissive, and subject to termination at the expiration of the contract, or upon one year's written notice, twenty-five years after the date of the contract. On the other hand, the occupancy of said right-of-way by appellant is characterized by appellee as an interest or permanent easement in the land. After a careful reading of the entire contract and a consideration of all its parts in the light of the situation of the parties and the facts and circumstances surrounding them at the time of its execution, we are convinced that the parties to the contract intended a permanent, and not a limited, occupancy, or easement. By reference to the preamble of the contract, it will be seen that appellant owned lines of telegraph on the right-of-way of said railroad company from Birds Point, Missouri, to Gatesville, Texas, which lines were being operated, under a contract of July 2, 1888, at the time this contract was signed. The contract of 1888 was not exhibited nor is

it disclosed how or when the telegraph company acquired the ownership of the lines, whether by prescription or conveyance. The fact of ownership of such lines by the telegraph company was regarded of sufficient importance to recite it in the contract. It is also disclosed by the preamble that the telegraph lines, so owned, constitute a telegraphic system covering parts of three States, which system was in actual operation at the time the new contract was signed. The agreed statement of facts revealed that the construction was of a permanent character. The poles, upon which the wires were strung, are cedar, set in the ground and guyed on curves with standard anchor rods. Two cross-arms were attached to each pole with through bolts and armed braces. The wires are on standard steel pins and insulators. The wires enter the depots through cables and the system is equipped with standard switchboards and Morse instruments. Section 9 of the contract, in express words, grants an exclusive easement to the appellant over the right-of-way for the purpose of enlarging and extending the telegraph system. No provision was incorporated in the contract for a removal of the lines or system from the right-of-way at the expiration of twenty-five years or on one year's written notice thereafter. The contract contained no forfeiture clause. Telegraph companies are invested with the power of eminent domain in this State, and, in the exercise of the power, may acquire an easement along a railroad right-of-way. This being true, and the telegraph company being in possession, the railroad company could not eject it at the expiration of the time limit in the contract. All these things point unerringly to the conclusion that the parties intended a permanent, and not a temporary, easement. It is almost inconceivable that a party owning a large system of telegraph over a railroad right-of-way, presumptively by grant, would give it in exchange for an occupancy for years, even though the time be for twenty-six years certain, and, after that, uncertain, dependent on a year's written notice by the railroad company. The thirteenth paragraph

of the contract, containing provisions to the effect that
the new agreement shall supersede the agreement made
in 1888 and shall be and continue in force for and during
the term of twenty-five years from the 13th day of July,
1901, and, after the term, until either party shall give
one year's written notice of an intention to terminate
same, does not necessarily conflict with a permanent
easement or interest in the land.   These clauses may be
very reasonably attributed to the method and reciprocal
duties of the parties incident to the operation of the sys-
tem, and not as relating to the right of the telegraph
company to remain upon the right-of-way and construct
its lines along and under the lands and bridges of the
railway company.   This is the construction placed upon
a contract of like tenor and effect in the cases of *Western
Union Tel. Co.* v. *Georgia Railroad & Banking Co.,* 227
Fed. 276; and *Western Union Tel. Co.* v. *State,* 9 Baxter
(Tenn.) 509.   We regard the reasoning in those cases
as accurate, and the conclusions based thereon as sound.
We therefore, adopt the construction of those courts
placed upon contracts of similar import as the one now
before us for interpretation.   Under this interpretation
of the contract, the property of the telegraph company
is real estate, and the commissioners of the road district
had a right, under section 5 of act 612, Acts of the Gen-
eral Assembly of 1919, to assess benefits against it.

The decree of the chancery court is therefore af-
firmed.